KELLEY and others, Respondents, vs. CRAWFORD, Appellant.

*November 29 — December 17, 1901.*

*Evidence: Entries in book: Title to land: Parol gift: Appeal: Findings.*

1. In order to authorize the reception in evidence of "entries in a book
or other permanent form," under sec. 4189, Stats. 1898, there must
be compliance with the provisions of said section requiring proof
that the entries were made in the usual course of business, con-
temporaneous with the transactions to which they relate and as
part of or connected with such transactions, and that they are true
and correct to the best of the knowledge and belief of the custo-
dian producing them. [Whether entries on loose sheets of paper
may ever be deemed to be in such permanent form as to be admis-
sible under said section, not determined.] .

2. Findings of fact by the trial court, so far as they were influenced
by evidence erroneously admitted, are to be regarded on appeal as
having been induced by an erroneous view of the law, and hence
to lack much of the ordinary force and conclusiveness of such find-
ings.

3. In an action of ejectment by part of the children of the person who
held the record title at the time of his death, against another son
who was in possession claiming title under an alleged parol gift
from his father, the evidence, eliminating documentary evidence
erroneously admitted and all inferences therefrom, is *held* to show,
by an overwhelming preponderance against the findings of the
trial court, that there was such a parol gift, followed by complete
possession and extensive and valuable improvements in reliance
thereon.

APPEAL from a judgment of the circuit court for Kenosha
county: FRANK M. FISH, Circuit Judge. *Reversed.*

Action in ejectment by six of the nine children of William
Crawford, who died intestate October 1, 1899, against *John
J. Crawford*, another child, to recover eighty acres of land
in Kenosha county, Wisconsin, of which the paper title has
at all times been in William Crawford, but which the de-

fendant has occupied as a farm continuously since the year
1875. The defense was first, an alleged parol gift from
William to *John J.*, consummated by possession and im-
provements, consisting of clearing the land and building
thereon residence, barns, etc.; secondly, adverse possession
for more than twenty years. The same facts were further
set up as a counterclaim, with prayer that title be adjudged
and quieted in defendant.

The case was tried to the court without a jury, and the
court found that William Crawford died seised in fee simple
and possessed of the premises in question; that the defend-
ant's occupation had at all times been in subservience to his
father, and not adversely, and not by a parol gift, and not
otherwise than by permission of William Crawford; that
defendant's possession is fully explained by the evidence
herein to have been permissive in its origin, and to have so
continued up to the death of William. Whereupon judgment
was entered in favor of the plaintiffs against the defendant,
adjudging the former to hold in fee simple six ninths of the
land in controversy and to be entitled to the possession
thereof; also dismissing defendant's counterclaim for con-
firmation of his title under the alleged parol gift. From
that judgment defendant appeals.

For the appellant there was a brief by *Wallace Ingalls*, at-
torney, and *Sanborn, Luse & Powell*, of counsel, and oral
argument by *Mr. Ingalls* and *Mr. A. L. Sanborn*.

For the respondents there was a brief by *Peter Fisher*,
attorney, and *John C. Slater*, guardian *ad litem*, and oral
argument by *Mr. Fisher* and *Mr. James Cavanaugh*.

DODGE, J. One question of the admissibility of certain
evidence, which obviously had much weight with the trial
court, naturally precedes a review of the findings. That
question arises thus: Defendant offered two loose sheets of

paper, bearing no label or designation or date. Each is in three columns, headed:

| Articles Sold, | Name, | Amount, $ · cts. |
|---|---|---|

They contain some twenty items of which the following are typical:

| 53 Steers | John Woodhouse | 507.— |
|---|---|---|
| | Cash $200; settled balance note | |
| Rent on Land | John Crawford; settled by note | 300.— |

All the entries were in the handwriting of a deceased daughter of William Crawford, Minnie, who frequently did his writing for him, and who, at the time of an auction sale, held before her father went to Minnesota in 1884, made up what witnesses called sale sheets, in collaboration with one Gleason, since deceased. There is no evidence that the papers offered in evidence were such sheets, nor when they were made. They are accounted for by testimony of a sister, *Hannah*, that after the father went to Minnesota, apropos of discussion as to what a certain party bid at the sale, Minnie produced these sheets out of her trunk, where she had some other papers and books of her father. The papers in question thereby became separated from the others, and remained with *Hannah* thereafter. There was also produced and admitted in evidence a stub book of promissory notes, on which were descriptions of notes in the handwriting of the deceased, Minnie, and among them the description of a note to William Crawford for rent on land, dated March 5, 1884, due in one year, $300, with nothing to indicate who was the debtor. In a different handwriting, which also appeared in notations of payment on other stubs, appeared the words, "Due — *John Crawford*." There was no evidence whatever as to this book, except that the original entries were in Minnie's handwriting, and that it was found among the papers of William Crawford after his decease.

The admissibility of these papers must depend upon the

provisions of our statute (secs. 4186, 4189). Sec. 4186 authorizes the introduction in evidence of nothing but account books, and therefore can have no applicability either to these separate sheets of paper or to the stub book in question. Neither is an account book. Sec. 4189, however, which is comparatively new legislation, authorizes the reception in evidence of " entries in a book or other permanent form, other than those mentioned in secs. 4186 and 4189*b*, in the usual course of business, contemporaneous with the transactions to which they relate and as part of or connected with such transactions, made by persons authorized to make the same, . . . when shown to have been so made upon the testimony either of the person who made the same, or, if he be beyond the reach of a subpœna, . . . of any person having custody of the entries and testifying that the same were made by a person or persons authorized to make them, in whose handwriting they are, and that they are true and correct to the best of his knowledge and belief." Waiving the question whether such fugitive sheets of paper may ever be deemed to be in such permanent form as to be admissible, there is no proof that the entries either upon the sheets of paper or upon the stub book were made in the usual course of business, were contemporaneous with the transactions to which they relate, or were a part of or connected with such transactions; nor that they are true and correct to the best of the knowledge and belief of the custodian producing same. This statute gives admissibility to documents which by the common-law rules of evidence would be excluded, and it is to take effect only upon reasonably strict compliance with all of the requisites which it prescribes. These most important ones being absent, the documents should not have been admitted in evidence, and should not have been considered by the trial court.

The record discloses that, after holding these documents admissible, the court, in the light of certain other facts, con-

strued them as establishing the payment of rent for the eighty acres in question by the appellant to his father in 1884, about eight years after the commencement of his possession. So construed, they were of course most cogent evidence against the existence of any gift from the father to the son, as also against the adverseness of the latter's possession. An act of this sort between the two parties to the alleged transaction could hardly be overcome by any evidence short of direct testimony as to the words which passed between father and son at the time of the supposed oral transfer. We cannot doubt — indeed, the opinion filed by the court excludes doubt — that these documents, so construed, had great weight upon the mind of the court in passing upon other testimony and in reaching his conclusion upon the facts embodied in his findings. Those findings, therefore, so far as influenced by such consideration, must be regarded as induced by an erroneous view of the law, thus depriving them of much of their force and conclusiveness. *Maldaner v. Smith,* 102 Wis. 30; *Hill v. Am. S. Co.* 107 Wis. 19, 26. It cannot be said that the court would have reached the conclusion he did as to either the parol gift or the quality of the possession, had he not first become convinced that the appellant had paid rent to his father. In the light of that belief, his whole testimony was discredited,— that in which he asserted his continuous claim to the land, and that in which he asserted the fact of payment of taxes and the cost of the buildings and other improvements, as also that by which he denied making certain statements after his father's death inconsistent with the claim of ownership.

Eliminating this error of law, we cannot avoid the view that a different conclusion ought to be reached, in deference to an overwhelming preponderance of evidence. In the case of alleged parol gifts between father and son, it is usually the case that no direct evidence of the transaction can be-

had after the father's death; for, if the claim be justified, the father's conduct consistent therewith does not, during his lifetime, call out discussion or arouse the son to taking any steps to vindicate or render certain his rights. We are therefore usually driven to an inference of what the transaction was from other facts. Under these circumstances, declarations of either party before controversy arises or is in contemplation are necessarily accepted, and must be relied on to a greater extent than in the proof of transactions between parties able to testify directly thereto. In this case we have, practically without dispute, the severance of this eighty acres from the father's other lands, some 320 acres; that severance followed immediately by occupation by the son; reducing to cultivation; erection of residence and necessary barns thereon so as to constitute it a separate and distinct farm; entire absence of the father's control or direction over its management, while the same continued to be exercised over his other and adjoining lands. This condition of things continued for nearly a quarter of a century,— the son at all times claiming to own the property, as he testifies; taking out the insurance in his own name; exercising his own judgment as to what buildings should be erected and as to how the farm should be cropped; and, as he testifies, paying the taxes thereon. That the appellant did pay for the erection of the buildings on the premises is directly testified to by him, and as to several of the buildings is further established by the testimony of the artisans working thereon; and no witness is produced to prove any payment by the father, except Mr. Grant, of Kenosha, from whom was purchased certain lumber supposed to be that of which the original house was constructed in 1876. We cannot think this testimony other than inconclusive. It was to the effect that the father and son came together and ordered the lumber, which was taken and hauled away by the son. It was charged upon Mr. Grant's books to the father,

with whom, he testifies, he had had previous dealings and of whose responsibility he knew.  He testifies in the most guarded manner to an impression that the bill was finally paid by the father, but says he derives that impression from his ledger entry of payment of the account thereon against the father.  The extreme uncertainty of memory of a lumber dealer, twenty years after the event, as to the facts and circumstances attending an ordinary sale of lumber in the usual course of his business, hardly needs to be suggested, when, as here, there was nothing to differentiate it from his daily experiences; and while, of course, the good faith of Mr. Grant's testimony is not to be doubted, it hardly seems to us sufficient to overcome defendant's testimony that he paid this lumber bill.  But, even if the fact were that the manual payment of the money was by William Crawford, that would not necessarily conflict with defendant's testimony that he paid for the erection of the buildings.  Aid from a wealthy father to a son by way of advance or loan of money would be highly probable, as also the transmission of money by his hand to a merchant in Kenosha might well account for its actual delivery by him.

Again, it is urged that the testimony of a sister tends to show that payment for the original house in 1876 by defendant is improbable.  That testimony is to the effect that when the father wrote appellant, then living in Minnesota, requesting him to come home, the latter asked for a remittance of $50 to pay the expenses of the trip.  The same witness testified that appellant had been in Minnesota some two years, had homesteaded, and had made a tree claim to certain lands.  From this it is argued that he had no property or money whereby he could have paid for the buildings.  The conclusion is not justified by the fact that he had not $50 in ready money to pay his traveling expenses.  It is well known that in 1875, when Minnesota was peopled with its pioneers, the ability to obtain money when wanted, even by those

holding considerable property, was not certain. It is entirely consistent with this witness's testimony that the appellant had real estate interests in Minnesota, from which he might, though not momentarily, have realized moneys. How much is, of course, without suggestion from the evidence.

This situation, thus outlined, receives further explanation from conversations and declarations of the father, testified to by many wholly disinterested witnesses, and extending through a considerable part of the period of defendant's occupancy and his father's life. While, as suggested by the trial court, declarations are feeble evidence when antagonized by positive facts or positive evidence, yet their weight is not to be ignored, and they vary according to their circumstances. Casual remarks, where the circumstances are not disclosed, are of course liable to be misunderstood and liable to be distorted in memory, and these considerations doubtless apply to some of the declarations offered in evidence; but there are others, made under circumstances of deliberation and as explanatory of the father's conduct at the time of making them, and testified to by people of intelligence, which we cannot believe should be ignored. Prominent among these is a negotiation had about 1888 with one Hollenbeck, then a tenant of William Crawford's land, to whom he made effort to sell an eighty acres. William Crawford offered and urged Hollenbeck to purchase the eighty acres on which he lived, lying south of that occupied by appellant; then another eighty further west; and at last Hollenbeck said to him: "The only eighty you could sell me is the eighty where *John* lives on." William Crawford replied: "I couldn't sell you that. That is *John's* eighty." This is certainly of weight. The desire of William Crawford to sell an eighty acres of land, the belief that he had a customer present, and the discovery that that customer would purchase none but this particular eighty makes the father's acknowledgment of his inability to sell it and of the reason therefor of much weight.

Another witness was James Reeves, who had lived near William Crawford for more than fifty years, and between them there had been evidently an intimate relation of acquaintance or friendship, marked by frequent visiting back and forth and confidential talk with each other about their respective affairs. Some time after *John* had returned and moved onto this eighty, when talking about their respective affairs, witness says: "He told me that he had given that eighty to his son *John* for a homestead, for he wanted one son near him." He also testifies to various less definite references to this eighty as *John's* property. Another quite definite conversation was with John McGuire, who was doing some work for William, and between them an evidently extended and gossipy conversation took place, in which the old gentleman explained his situation and pointed out what lands he had; also as to his son *John's* condition; and the witness put the question: "Does *John* own the place he is on?" to which he replied: "Yes, I gave him that. He is the only boy that stayed at home with me." He also proceeded to point out other land which *John* owned in the neighborhood. One Crosby was another. He was threshing on *John Crawford's* farm, when the old gentleman came over and seated himself in the shade of a tree, and invited the witness to sit down and gossip, and the old gentleman proceeded to speak of *John's* crops and success as a farmer, and said: "It is a good deal different place than it was hard onto twenty years ago when I gave him this place. It was a pretty wild-looking place then. The boy has done well on the place since he came here. He has built these buildings, and fenced it, and the improvements he has put on the place since he has been on it is worth more than the place was when I gave it to him."

The remarks in these conversations were not casual. The desire to talk over his situation, to invite his friends to observe his prosperity and his son's was apparent, and motive

to misrepresent was entirely lacking. Further, enough of the conversations is related to show that his declaration of actual giving was not confused with a mere purpose to give or to so divide his property that this particular piece should ultimately become the property of the son *John*. It is impossible to doubt that these conversations took place, and it seems beyond belief that they could have taken place unless there had been a gift to *John*, resulting in the conceded occupation and extensive improvement of this piece of ground. In the light of all these circumstances and unambiguous declarations of the alleged grantor, we are constrained to the conclusion that the fact of a parol gift from William Crawford to the appellant was established by certain and unmistakable evidence of the best quality capable of presentation after the death of either party has closed the door to direct testimony of the transaction, and satisfied the rule prescribed by *Hawks v. Slight*, 110 Wis. 125, 129.

We cannot think the case thus made is thrown into any substantial doubt by the testimony of two of the interested parties to certain declarations of the appellant, made after the death of William Crawford, which, if understood and related aright, are inferentially opposed to the existence of an understanding on his part that he owned the land in question. Of course, the other requirements of actual and exclusive possession, commencing with the parol gift and continuing unbroken to the day of trial, and the making of substantial and valuable improvements in reliance on the gift, within the requirements of the law as stated in *Rodman v. Rodman, post*, p. 378, appear fully.

Upon the whole case, therefore, eliminating the inadmissible documentary evidence and all inferences therefrom, we conclude that a parol gift, followed by complete possession and extensive and valuable improvements in reliance thereon, is proved by overwhelming preponderance of evidence, so that judgment should have been rendered in favor of the

defendant both upon the case presented by the complaint and upon defendant's counterclaim. Consideration of the further defense of adverse possession for more than twenty years is therefore unnecessary.

*By the Court.*— The judgment of the circuit court is reversed, and cause remanded with directions to enter judgment dismissing the complaint and adjudging good and perfect title in the defendant in accordance with the prayer of his counterclaim.