**Allen VEZEY, Appellant,**

v.

**Angela GREEN, Appellee.**

**No. S–9440.**

Supreme Court of Alaska.

Nov. 16, 2001.

---

16

William R. Satterberg, Jr., Fairbanks, for Appellant.

No appearance by Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. *INTRODUCTION*

Angela Green took possession of part of her family's land in 1982. The land was probably an oral gift to Green from her grandparents. For the following decade, Green lived on the land during the summer. She gradually built a house, cleared surrounding land,

cultivated a garden and fruit trees, and raised poultry. In 1994 her grandparents sold their interest in the land to Allen Vezey. Green brought suit claiming that she had gained title by adverse possession to the house and surrounding land. The superior court upheld her claim. Vezey now challenges the finding of adverse possession as well as the superior court's determination of what land Green actually possessed. Because Green has demonstrated adverse possession of part but not all of the area awarded, we affirm as to the north, east, and south portions, but remand as to the west portion.

## II. *FACTS AND PROCEEDINGS*

In 1982 Angela Green's grandmother, Billie Harrild, offered Green a piece of the family's land near Shaw Creek. Billie was declining in health, and wanted her granddaughter to have a home near the Harrilds' own. Green selected a parcel of land on a bluff, across Shaw Creek from her grandparents' house. The alleged gift was not recorded, and Billie and Elden Harrild, the grandparents, and John Harrild, a cousin, remained the owners of record. However, according to Green's testimony, in the ten years following her entry onto the property, all three "absolutely" recognized the land as hers. John Harrild, the only record owner alive at the time of trial, waived participation in this case and indicated his agreement that Green's claims be recognized. Neighbors testified that Billie consistently referred to the land as Green's property, and a stranger to Green who asked Billie about buying the property around 1987 testified that she told him she could not sell the bluff because it belonged to her granddaughter. Elden and Billie Harrild died in the winter of 1995–1996.

Between 1982 and 1992 Green gradually constructed a house and cultivated grounds on the bluff. She worked on the property over the summers, and worked as a nurse and glassmaker in California for the rest of the year. In 1982 she planned the site of her house and cleared trees on the lot. In the summers of 1983 and 1984 she lived in a camper on the property, cleared more trees and stumps, and oversaw hand excavation for

the foundation of the house. In the following summers, she gradually expanded the cultivated section of the property, planting lilac bushes and fruit trees and installing a coop for chickens and turkeys. A neighbor, Art McTaggart, helped to erect the house itself and to install a water system, propane heater, electrical wiring, and a generator. He worked with Green on the house every summer from 1982 through 1991. Beginning in 1987 Green lived in the nearly complete house during the summers. She arranged for telephone service beginning around 1985, and dealt with fire authorities to determine how far away from the house to clear trees. In 1986 Green worked in Fairbanks the whole year and visited the property by snow machine during the winter; in 1989 she lived on the property for eight or nine months. Green lived on the bluff and with her grandmother for a month and a half in the summer of 1992, but did not come to Alaska in 1993.

Green left trees standing on much of the property, but cleared undergrowth and planted native plants over an area of several acres. She also cut trees from a wide area on the southern hillside in order to clear the view from the cabin. She posted "No Trespassing" signs and built benches in some areas away from the house. She put up a chain across the road entering the property, but did not fence the entire area. Although the improvements were not entirely visible from the road, a neighbor testified that local residents as far away as Delta Junction, twenty miles down Richardson Highway, knew of the bluff as Angela Green's property. A lien filed against the property reflected this belief: Despite the fact that land records showed the Harrilds as owners, the lien declared that Green held the property either in her own right or as a constructive trust for Billie.

In 1990 the house was considerably damaged by vandalism. Green repaired the damage when she returned to Alaska in the spring. Witnesses who visited the property in the summer of 1993, the year that Green did not visit Alaska, said that the house looked empty, vandalized, and not kept up.

Green arranged with her grandparents that, for the remainder of their lives, they

could extract and sell small quantities of rock from the property in order to support themselves and John Harrild. This extraction was not to involve heavy equipment; according to Green, both she and Billie Harrild strongly opposed use of such equipment on the property.

Sometime between 1988 and 1991 the Harrilds executed a contract with an extraction company, Earthmovers, allowing them to excavate rock from the family property, including the bluff. The contract apparently included an option for Earthmovers to buy the property. According to Green, Billie's mental capacities were declining at the time of this contract, and she no longer handled her own finances or affairs.

Earthmovers excavated a trench on the bluff on a day when Green was not at home. When Green returned and found the workers and equipment on the property, however, she told them that they were not allowed to excavate there. Green granted the workers permission to finish the task at hand, insisted that they arrange to repair a telephone line that they had damaged, and ordered them to leave the property.

In 1988 Allen Vezey became interested in Shaw Creek area properties. Vezey planned to consolidate property in the area in order to quarry for rock. He purchased property adjoining the Harrilds' and carried out dynamiting and excavation. Green testified that Billie strongly opposed this use of the property, and that her grandmother was "absolutely livid" with Vezey.

Vezey approached the Harrilds about purchasing their land in 1993. He and his engineer, Ken Colette, had a number of meetings with the Harrilds. Both testified that the tone was cordial and Billie exhibited no hostility toward Vezey, although Colette testified that Billie Harrild was "in and out of cognizance" during this period, and that he himself would have been reluctant to enter into a contract with her at times. According to Vezey, the Harrilds mentioned Green only to say that they planned to give her an acre of land. Colette recalled mention of "Angela's acre" in early meetings with the Harrilds, but did not testify that the Harrilds said the land was only a planned gift for the future.

The Harrilds' statements caused Vezey and Colette to double-check the property records for the bluff area—a response which suggests that the Harrilds gave Vezey reason to fear that Green already owned the land.

In 1994, while Vezey was still in negotiations with the Harrilds, he received a phone call from Angela Green. According to Vezey, Green was "borderline hysterical" and objected to his purchasing the property. She expressed some involvement or interest in the land, he testified, but did not say that she owned it. According to Green, she told Vezey during the phone call that the land belonged to her, that it was not for sale, and that he was to stay off of her property. The trial court accepted Green's version of the call, and expressed scepticism about Vezey's testimony on this and other issues.

In the winter of 1994–1995 Vezey purchased Elden Harrild's one-third interest in a property which included the contested bluff area. He separately purchased Billie Harrild's one-third interest from her son James, who obtained and recorded power of attorney on the same afternoon as the closing. John Harrild (who does not contest Green's ownership claim to the bluff) retained the remaining one-third interest in the family property.

After Vezey purchased the property, Green brought suit against him, John Harrild, the deceased Elden and Billie Harrild, and Billie's estate. Only Vezey contested the action. Green's complaint stated that she had been given Elden and Billie's interest in the property through a parol gift, and that her possession had at all times been open, notorious, and hostile to the claims of all others. At trial, Green claimed ownership of the bluff property by adverse possession. Both parties presented detailed witness testimony regarding the area used by Green, and Green presented two witnesses to attest to the duration and nature of her use. After four days of trial, Superior Court Judge Richard D. Savell held that Green had by adverse possession acquired title to the entire bluff area. Vezey appeals.

### III: STANDARD OF REVIEW

We review the trial court's findings of

fact under the "clearly erroneous" standard.[1] Under this standard, we will reject a factual finding only if we are "left with the definite and firm conviction on the entire record that a mistake has been committed."[2] In addition, we have stated that "[w]hen a trial court's decision of a factual issue depends largely on conflicting oral testimony, the trial court's competence to judge credibility of witnesses provides even a stronger basis for deference by the reviewing court."[3]

We use our independent judgment in reviewing the trial court's legal analysis,[4] and adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[5] Our review of the denial of a motion for summary judgment is de novo.[6]

## IV. DISCUSSION

We must consider three sets of issues. First, whether Green has met the requirements for adverse possession; second, whether the alleged parol gift affects her adverse possession claim; third, procedural issues raised by Vezey.

### A. Adverse Possession

Under AS 09.10.030, Green may claim title to the bluff property by adverse possession only if she shows by clear and convincing evidence[7] that she has possessed the property for ten consecutive years.[8] We

stated in *Nome 2000 v. Fagerstrom* that "in order to acquire title by adverse possession, the claimant must prove, by clear and convincing evidence, ... that for the statutory period his use of the land was continuous, open and notorious, exclusive and hostile to the true owner."[9] Continuity, notoriety, and exclusivity of use, we explained, are "not susceptible to fixed standards," but rather "depend on the character of the land in question."[10]

### 1. The statutory period

An adverse possession claimant must show that she possessed the property for the statutory period of ten years.[11] Judge Savell found that Green had used the bluff property from 1982 through the summer of 1993, in satisfaction of AS 09.10.030's ten-year possession requirement for adverse possession. Because Green presented the most evidence of consistent use for the period running from early summer of 1983 to early summer of 1993, we base our adverse possession analysis on those ten years.

Vezey challenges the evidentiary sufficiency of the superior court's finding that Green used the property during this time; he claims that Green admitted to being absent in 1991 or 1992. At trial, Green did say that she had missed a visit in one year, and hesitated briefly as to whether that year was

---

1. *Peters v. Juneau Douglas Girl Scout Council,* 519 P.2d 826, 833 (Alaska 1974).

2. *Alaska Foods, Inc. v. American Mfrs. Mut. Ins. Co.,* 482 P.2d 842, 848 (Alaska 1971).

3. *Tenala, Ltd. v. Fowler,* 921 P.2d 1114, 1118 n. 5 (Alaska 1996).

4. *See Walsh v. Emerick,* 611 P.2d 28, 30 (Alaska 1980).

5. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

6. *See Western Pioneer, Inc. v. Harbor Enters., Inc.,* 818 P.2d 654, 656 n. 3 (Alaska 1991).

7. *See Curran v. Mount,* 657 P.2d 389, 391–92 (Alaska 1982).

8. AS 09.10.030 states:
 A person may not bring an action for the recovery of real property, or for the recovery of the possession of it unless the action is com-

menced within 10 years. An action may not be maintained for the recovery unless it appears that the plaintiff, an ancestor, a predecessor, or the grantor of the plaintiff was seized or possessed of the premises in question within 10 years before the commencement of the action.
 This court has interpreted the statute as creating a time period for adverse possession claims absent color of title. *See Peters v. Juneau–Douglas Girl Scout Council,* 519 P.2d 826, 830 n. 13 (Alaska 1974).

9. 799 P.2d 304, 309 (Alaska 1990) (internal quotations and citations omitted).

10. *Id.; see also* 3 Am.Jur.2d *Adverse Possession* § 22, 112–13 (1986) (requirements for finding of actual possession vary with the character of the property).

11. *See* AS 09.10.030.

1991, 1992, or 1993. However, she concluded that the missed year was 1993, seeming to place it by reference to the more memorable visit of the following year. Art McTaggart also testified that he had worked with Green in 1991, and Green later testified that she had filed an insurance claim following a break-in to the house in 1992. Vezey's own testimony and that of others who visited the bluff in 1993 indicate that this indeed was the year of Green's absence. This evidence supports the conclusion that Green possessed the property at least from early summer of 1983 to the same season in 1993, in fulfillment of the statutory ten-year-period requirement.

### 2. *Continuity*

▆▆▆ Vezey argues that because Green has spent only short periods of time on the bluff property, her occupation has not been continuous. In *Nome 2000*, we stated that continuity required "only that the land be used for the statutory period as an average owner of similar property would use it." [12] This flexible standard for continuous use in adverse possession claims is appropriate to Alaska's geography and climate, and is established in our jurisprudence. We found that the *Nome 2000* claimants, a family that had made periodic subsistence use of a rural par-

cel of land, satisfied the continuity requirement for adverse possession. [13] In reaching this conclusion, we cited with approval a Utah case in which pasturing sheep for three weeks each year was found sufficient to adversely possess land suitable only for grazing, [14] and a Michigan case in which six yearly visits to a hunting cabin and some timber cutting were found sufficient to possess wild and undeveloped land. [15]

▆▆▆ In addition, where land is best suited for seasonal use, such use may satisfy the continuity requirement. [16] The trial court heard undisputed testimony that "[i]t'd take a fool to live up there [on the bluff property] in the cold winter months." Given the bluff's location and unsuitability for winter use, Green used the property as an average owner of similar property would and therefore meets the requirement for continuous use under *Nome 2000*. [17]

Vezey challenges the evidentiary sufficiency of the superior court's factual findings, claiming that Green did not actually use or improve the property prior to 1987. He implies that Green testified that she did not work on the house in those years; however, the testimony which he cites for this claim establishes only that Green *did* do other things, such as camping, visiting her grand-

---

12. 799 P.2d at 309. Continuous possession must also be uninterrupted in order to ripen into adverse possession. *Alaska Nat'l Bank v. Linck*, 559 P.2d 1049, 1052 (Alaska 1977). The superior court found that Green's possession had been interrupted for one day by the Earthmover equipment and workers, but that this did not destroy her claim because the interruption was of such short duration and because Green acted as an owner in ordering them off the property. Vezey does not challenge this conclusion.

13. 799 P.2d at 309–10. *Alaska National Bank v. Linck*, 559 P.2d 1049 (Alaska 1977) includes discussion, germane to this case, of evidence that supports a finding of continuous actual possession. *Linck* concerned an undeveloped parcel located very near to Green's bluff along the Richardson Highway. *Id.* at 1049. In that case, we found that an adverse possessor who only periodically visited a property and who never erected a building there, but who did cultivate a garden during two summers, installed a power line and access road, put up a barricade on the road, gathered litter, and interacted as an owner with state agencies and a public utility company, had actually possessed and established a claim to the

44 acre lot. *Id.* at 1049, 1053–54. Our conclusion in that case also relied on community repute. *Id.* at 1054.

14. *Id.* at 309 (citing *Cooper v. Carter Oil Co.*, 7 Utah 2d 9, 316 P.2d 320 (1957)).

15. *Id.* at 309 (citing *Monroe v. Rawlings*, 331 Mich. 49, 49 N.W.2d 55, 56 (1951)).

16. *See* 3 Am.Jur.2d *Adverse Possession* § 83 (1986) (seasonal use adequate for showing continuity in adverse possession cases). In *Nome 2000*, although we did not explicitly base our holding on the property's seasonal suitability for use, we noted that the disputed parcel was best suited to summer uses, and that little or no use was made of the property in the winter months. *Nome 2000*, 799 P.2d at 307.

17. *See also Linck*, 559 P.2d at 1052 (citing adverse possession claimant's periodic visits to a rural property, work clearing the land and keeping it clean, and construction and maintenance of barricades as evidence of continuous use).

mother, and leaving Alaska for the winter. In addition, Vezey complains that there is no documentary evidence of the work prior to 1987. Green and two other witnesses testified that Green began working on the house in 1982 and continued through 1987 and beyond. Given this testimony and the trial court's particular competence to assess the credibility of witnesses, its conclusion that Green continuously used the property is not clearly erroneous.

### 3. *Exclusivity*

Vezey argues that Earthmover's use of the bluff property demonstrates that Green's claim was not exclusive. Green also allowed her relatives to take rock from the bluff property. These facts do not preclude a finding of exclusive use.

Like continuity, exclusivity requires "only that the land be used for the statutory period as an average owner of similar property would use it."[18] In *Nome 2000*, the adverse possessors of rural property allowed others to enter the land in order to pick berries and fish, but excluded a group of campers who took and burned the family's firewood.[19] We held that allowing berry-picking and fishing was "consistent with the conduct of a hospitable landowner."[20] We did not find, or even suggest, that exclusivity of possession had been affected by the campers' actions. Green's situation is closely analogous: She allowed moderate use of her resources, but when uninvited trespassers tried to excavate rock, she ordered them off the property. As the superior court stated, Green "acted as an owner" in directing the Earthmover crew to leave. This finding meets *Nome 2000*'s requirement that an adverse possessor demonstrate exclusivity by using the land "as an average owner of similar property would use it."[21]

### 4. *Notoriety*

We have stated that "the function of the notoriety requirement is to afford the true owner an opportunity of notice."[22] This requirement is fulfilled when the record owner knew or should have known of the adverse possession—"what a duly alert owner would have known, the owner is charged with knowing."[23] In this case, we need not examine the question of constructive notice, because the record owners had actual notice. During the statutory period, the record owners of the bluff property were Billie, Elden, and John Harrild. It is undisputed that all three owners knew of Green's presence on the bluff. Therefore, the notoriety requirement has been met.[24]

### 5. *Hostility*

In order to meet the hostility requirement, adverse possession claimants must prove both that they acted as owners and that they did not act with the true owner's permission.[25] As we have explained:

> The determinative question is whether or not the claimant acted toward the land as if he owned it. However, the hostility requirement is not satisfied if the adverse claimant has the record owner's permission to use the property. There is a presumption that one who possesses or uses another's property does so with the owner's permission. The adverse claimant may re-

---

18. *Nome 2000*, 799 P.2d at 309; *see also Peters*, 519 P.2d at 831 (possessor did not disrupt his exclusive possession by allowing visitors to dig for clams).

19. 799 P.2d at 308, 310.

20. *Id.* at 310.

21. *Id.* at 309.

22. *Id.* at 309 n. 7.

23. *Shilts v. Young*, 567 P.2d 769, 776 (Alaska 1977), *quoting Linck*, 559 P.2d at 1053.

24. Because the notice requirement pertains only to the record owner, the adverse possessor's title does not directly depend on whether parties other than the record owner are on notice of the adverse possession. A purchaser of land from the record owner does not have a cause of action against an adverse possessor whose title has already ripened; rather, the purchaser's remedy lies in an action against the person who sold the adversely possessed land. *See generally* 17 Richard A. Lord, Williston on Contracts § 50, 274–583 (4th ed.2000).

25. *See Smith v. Krebs*, 768 P.2d 124, 126 (Alaska 1989).

but this presumption by showing that he was not on the owner's land with permission, and that the record owner could have ejected him.[26]

■ Because of her extensive work on the property, Green has satisfied the first requirement of using the land as if she owned it. She has also rebutted the presumption of permissive use. The trial court found by clear and convincing evidence that Green held the property as an owner, not a tenant or licensee. Her occupancy was not permissive because it was not dependent on the consent or permission of the Harrilds. Therefore, it was legally hostile to the record owners.

As the superior court noted, the Earthmovers incident presents particularly compelling evidence that Green's possession was hostile to the interests of all others, including the Harrilds. By excluding her grandparents' contractors from the property, Green indicated that she claimed all rights to the property as her own; she did not recognize any residual interest held by the Harrilds or any subordination of her own title to theirs.[27]

■ Vezey challenges the superior court's finding of hostility on two grounds. First, he argues that the statute of frauds bars transfers of real property by oral promise. Because Green's claim is based on adverse possession and not on the validity of the gift itself, the statute of frauds is irrelevant. Second, he asserts that Green's possession could not have been hostile because it was permissive. Vezey's evidence in support of this claim is unpersuasive: He wrongly claims that Green herself testified that her occupancy was permissive, and inaccurately implies that the superior court reached the

same conclusion. We reject these challenges, and affirm the superior court's finding of hostile possession.

Because Green demonstrated all of the elements of adverse possession, Judge Savell properly concluded that she has established title to the bluff property. In the next section, we will consider how the alleged parol gift affects her legal claims.

### B. The Alleged Parol Gift Reinforces Green's Adverse Possession Claim.

■ Vezey argues that because Green held the bluff property as a gift from her grandparents, her possession was permissive. Therefore, he claims, she cannot meet the hostility requirement for adverse possession. We reject this argument because possession of land based on a gift is not the same as possession by permission of the true owner. A donee who accepts a gift of land asserts a property right independent of the record owner's. The possessor's use of land in these circumstances is not permissive because the possessor's claim is not subordinate to the record owner's title; it is instead an assertion of ownership in the possessor's own right.

Almost all state courts concur that land transferred by parol gift may become the donee's property through adverse possession.[28] Most require that claimants prove the donor's intent to transfer ownership by clear and convincing evidence.[29] This focus on the record owner's intent is in keeping with our own cases requiring adverse possession claimants to prove that record owners did not intend to permit use of the land by the claimant.[30]

26. *Id.* (internal quotations and citations omitted).

27. *See Hubbard v. Curtiss,* 684 P.2d 842, 848 (Alaska 1984) (discussing acknowledgment that grantee's title is not subordinate as element of hostility in grantor-grantee relationship).

28. *See* V. Woerner, Annotation, *Adverse Possession Under Parol Gift of Land* § 2, 43 A.L.R.2d 6 (1955); 3 Am.Jur.2d *Adverse Possession* § 219 (1986). Only Virginia has adopted a rule that adverse possession cannot be founded on a parol gift of land. *Clarke v. McClure,* 51 Va. (10 Gratt) 305 (1853).

29. *See Eldridge v. Loftis,* 723 So.2d 562, 564 (Ala.1998); *Andreotti v. Andreotti,* 224 Cal.App.2d 533, 36 Cal.Rptr. 709, 713 (1964); *Mertz v. Arendt,* 564 N.W.2d 294, 296 (N.D.1997); *Barnwell v. Barnwell,* 323 S.C. 548, 476 S.E.2d 492, 497 (1996).

30. *See Tenala, Ltd. v. Fowler,* 921 P.2d 1114, 1120 (Alaska 1996); *Swift v. Kniffen,* 706 P.2d 296, 303–04 (Alaska 1985).

When a record owner gives property as a gift, the gift strengthens the possessor's claims to the property by establishing that the possessor claims full ownership, and that the record owner knows of her claim. We conclude that a parol gift of land, when proven by clear and convincing evidence, establishes two presumptions helpful to the adverse possession claimant. First, the donee's claim to the property is presumptively hostile to the donor. As we have explained of the relationship between buyers and sellers of land, "once the grantor has purported to convey property, neither he nor his grantee believe that the grantee's possession is subordinate to the grantor's title."[31] Similarly, when a gift has been made, and both the record owner and the possessor believe that the possessor owns the property, the possessor's claim is hostile.

Second, when a possessor's claim to property is founded on a gift from the record owner, we will presume that the notoriety requirement has been satisfied. "The function of the notoriety requirement is to afford the true owner an opportunity for notice."[32] When the record owner herself gave the property away, such notice may be presumed.[33]

In its decision below, the trial court did not determine whether the alleged initial gift of land had taken place, although its findings strongly suggest that a gift was made.[34] Because Green has made the stronger showing necessary to prove adverse possession without a gift, she would necessarily also meet the lower threshold for adverse possession based on a gift.[35]

## C. Boundaries of the Contested Property

The superior court found by clear and convincing evidence that Green adversely possessed a parcel defined by a telephone line to the north, Shaw Creek to the east, Old Richardson Highway to the south, and a line 300 feet from the house to the west. The parcel is rectangular, with the house closest to the northern border and roughly equidistant from the east and west borders. To the south and east, the land slopes and becomes a cliff descending to Shaw Creek on the east and Old Richardson highway on the south.

Vezey argues that the area defined by the superior court was not adversely possessed by Green. He maintains that the court's reliance on "natural boundaries" to define the property is without legal precedent, that the area defined by the court includes land not "actually possessed" by Green, and that the evidence was insufficient to support the court's findings.

Judge Savell's use of the road, creek, and telephone line as boundaries poses no legal problem in itself. Natural barriers such as rivers may serve as boundaries in adverse possession cases.[36] Vezey presents no argument why these "natural boundaries" are themselves objectionable.

The more serious issue raised by Vezey is whether Green actually possessed all of the land enclosed by those boundaries. Courts may look to a number of factors in

---

31. See Hubbard, 684 P.2d at 848 (finding that grantee purchaser was an adverse possessor where he took possession of one property, but inadvertently accepted a deed describing a second property).

32. See Nome 2000, 799 P.2d at 309, n. 7.

33. Cf. Humphrey v. Harrison, 646 S.W.2d 340, 342 (Ky.1983) (holding that parol gift itself constitutes notice to donor that occupant's possession is adverse).

34. For example, the court found that the record owners acknowledged before the 10 year period had run that Green owned the property.

35. We note that some states have adopted an alternate theory to support parol gift donees' claims to real property. Following this theory, a claimant who shows evidence of (1) the donor's intent to make a gift and (2) her own reliance on the gift in making valuable improvements to the property may establish ownership despite the statute of frauds. See, e.g., Locke v. Pyle, 349 So.2d 813, 815 (Fla.1977); Gran v. Gran, 290 N.W. 241, 242–43 (N.D.1940); Holohan v. McCarthy, 130 Or. 577, 281 P. 178, 181 (1929); Adams v. Adams, 205 S.W.2d 801, 802 (Tex. 1947); Kelly v. Crawford, 112 Wis. 368, 88 N.W. 296, 299 (1901). This theory was not argued by either party or considered by the superior court below, and we therefore do not reach it.

36. See Bentley Family Trust v. Lynx, 658 P.2d 761, 769 (Alaska 1983).

determining what area of land a claimant has actually possessed. Evidence of actual possession must be sufficient to alert a reasonably diligent owner to the possessor's exercise of dominion and control.[37] Visible evidence of use, such as occupation, fencing, and construction of permanent improvements, provides particularly compelling evidence of actual possession.[38] The threshold for legal sufficiency of such physical acts as proof of possession, however, varies with the character of the land.[39] Other factors, such as the possessor's exclusion of other people from the property,[40] community repute,[41] the intent of the adverse possessor,[42] and the extent of the possessor's use as perceived by the record owner[43] may all be relevant to a determination of actual possession. Such evidence is particularly relevant in this case because Green's possession was predicated on a gift; the court found that the record owners recognized her property claim to the bluff during the adverse possession period. The record does not, however, offer clear evidence of where Green or the record owners believed the boundaries of the bluff property to lie. Our inquiry will therefore focus on the physical indicia of use as well as the apparent intent of Green and the record owners. We note that an adverse possessor may claim title only to that area actually possessed for the full statutory period, from the first year to the last: While evidence from later years is relevant to continuity of use, the adverse possessor may not rely on evidence from later years to expand the boundaries of her claim.

### 1. North of the house

 The trial court found that Green had used and adversely possessed the land between the house and a telephone line to the north. This conclusion was supported by the evidence, and was not clearly erroneous. To the immediate north of the house, Green built the structure housing her electrical generator, installed a propane tank, and stored gardening supplies. She also cleared undergrowth from the woods as far as the phone line, and when the telephone poles were replaced, arranged to haul out the old logs to use as construction material. In the area between the house and the telephone line, to both the northeast and northwest of the house, she raised chickens in a movable pen. The telephone line was also the border of the land originally held by the Harrilds; the record contains no indication that they intended to give Green less than the full northern portion of the bluff.

### 2. East of the house

 Green's use of the eastern area of the claimed property was also sufficient to demonstrate actual use for purposes of adverse possession. To the immediate east of the house, Green planted a garden. Further

---

37. *See Nome 2000,* 799 P.2d at 311.

38. *See id.; Tenala, Ltd. v. Fowler,* 921 P.2d 1114, 1119 (Alaska 1996).

39. *See Nome 2000,* 799 P.2d at 309. At trial, Green argued that her legal claim to possess the property should not be diminished by the fact that she maintained many natural features of the bluff landscape. She objected vehemently to a legal standard that "means you possess something because you totally destroy it." Green's conservation-oriented uses of the property, which included planting indigenous rather than non-native plants and thinning trees and undergrowth rather than clearing them entirely, have the same legal weight as would more transformative or destructive uses: They are significant to the extent that they did, or should have, alerted the record owner to the adverse possession.

40. *See Tenala, Ltd.,* 921 P.2d at 1119.

41. *See Nome 2000,* 799 P.2d at 309.

42. *See* 3 Am.Jur.2d *Adverse Possession* § 19 (1986).

43. In *Bentley Family Trust v. Lynx,* 658 P.2d 761, 769 (Alaska 1983), a record owner argued that adverse possessors had actually possessed only one of two adjoining lots, because the adverse possessors had "acted as the true owners" by leasing one lot, but not the other. *Id.* at 768. We rejected this argument on the grounds that the record owner herself had treated the two lots as unified property, and had never prior to the lawsuit recognized any

> invisible line dividing what she commonly referred to as the property "across the Steese [Highway]". In actuality, the highway to the east and the slough to the west provided easily identifiable natural boundaries marking the triangle property and were treated as such by the parties involved.

out, at a distance of some forty feet from the house, she put in fruit trees and perennials. She also cleared a trail leading from the house southeast to the edge of the bluff. In the northeast area of the bluff, she set up a picnic table and bench, and used the area for outdoor lunches. In addition, Green extracted rock from the eastern bluff throughout the adverse possession period. The extraction areas were in the northeast corner of the property, at the top of the bluff, and in the southeast corner at the bottom of the bluff.

A neighbor offered strong testimony that the "bluff side of Shaw Creek" overlooking Billie Harrild's house—an area defined by Green's claimed eastern border—was locally reputed to belong to Green, and Green testified that she believed her grandmother had given her "that piece of the [family's] property across from Shaw Creek." In *Bentley Family Trust v. Lynx Enterprises,* we found that an adverse possessor took title to property bordered by a highway and a slough, in part because the record owner and adverse possessor had treated the highway and slough as boundaries enclosing the possessor's unified parcel of property.[44] Following *Bentley Family Trust,* evidence that Green, the record owners, and others in the community believed that Green owned land bordered by Shaw Creek weighs significantly in favor of her actual possession claim for this part of the property.

Much of the eastern section of the property is a steep slope descending to Shaw Creek. As Vezey's engineer testified, the property is difficult to use; he suggested that a landowner's use for the area might reasonably be limited to toboggan runs. Because the actual use required of adverse possessors varies with the nature of the property,[45] we conclude that Green's activities on the claimed land to the east of the house are sufficient to show actual use, and

that Judge Savell correctly awarded her the eastern area of the bluff property.

### 3. *South of the house*

■ Green's use of the land between the house and the Old Richardson Highway to the south was less extensive than her use of the eastern area. Given the character of the land, however, her activities are still sufficient to show actual use. Like the eastern side of the property, the area to the south is a bluff face descending steeply to a natural boundary: the old Richardson highway.[46] Unlike the eastern area, there is not a significant flat area between the house and the slope; Ken Colette indicated that the steep drop-off began only about thirty-five feet from the house. As was discussed above, Green extracted rock from the southeast corner of the property, at the base of the bluff. In addition, she cleared trees to the south of the cabin in order to see the Alaska Range from her house. Over a period of years, she enlarged the cleared area to the southwest in order to bring more mountain peaks into view. Green testified that she had originally planned to plant lilac bushes along the cleared southern slope, but decided to keep the natural foliage because she "didn't want to look out on anything that looked citified like that." Given the rugged nature of the bluff's south slope, Green's activities in clearing trees to the south and southwest and quarrying for rock to the southeast are sufficient to support the trial court's finding that she adversely possessed the area.

### 4. *West of the house*

The superior court found that Green had by adverse possession established title to property extending 300 feet to the west of the house. Although the court did not specify what evidence of actual use supported its conclusion, the record contains evidence that Green used at least some of the area to the

*Id.* at 769.

44. 658 P.2d 761, 769 (Alaska 1983).

45. *See* 3 Am.Jur.2d *Adverse Possession* § 22 (1986).

46. The record contains no direct evidence as to whether Green's grandparents intended to give Green the southern edge of the property as part

of the alleged gift. However, the superior court heard testimony on community repute, based in part on the witnesses' conversations with Billie Harrild, that "Angela's place" consisted of "the bluff itself." It seems likely that "the bluff" would include not only the top but the steep sloping sides which define a bluff, and would therefore encompass both the east and south portions of the claimed property.

west of the house. There is also some indication that Green believed herself to be the owner of land extending to the western end of her grandparents' lot: In the 1980s, she looked into purchasing the adjacent land to the west. However, it is not clear which, if any, of Green's physical uses supports the superior court's finding that her possession extended 300 feet west from the house. Therefore, we remand the case for additional findings supporting the trial court's conclusion, or for reconsideration of the western boundary of Green's property.

Green and other witnesses testified to three uses of the land to the west of the house. To the southwest, Green cleared trees to improve the view from the house. To the northwest, Green testified that she raised chickens and turkeys. Nothing in the record indicates how far to the west these activities extended. In addition, beginning in 1982, Green cleared and used an old road running across the western portion of the claimed property; she put a chain across the road at the border of the neighboring property and mounted "No Trespassing" signs. The road cut up from Old Richardson Highway and across the neighboring property to reach the top of the bluff. Green invested substantial time and labor in clearing the access road: She testified that she removed trees four inches in diameter from a swath wide enough to drive through.

The record suggests two possible locations for the access road cleared by Green. Most testimony suggests that her road cuts through the navigable flat land directly to the west of the house, but other testimony indicates that the road runs along the telephone line at the northern edge of the property. In addition, it is unclear from the record whether the location of Green's chain across the road correlates to the 300–foot boundary defined by the court, or whether the chained section was in fact nearer or farther than 300 feet from the house.

*Nome 2000 v. Fagerstrom*[47] provides some benchmarks for determining what actual use is sufficient to establish adverse possession. In that case, we found that the claimants' use of the north end of a disputed property constituted adverse possession, while their use of the south end did not.[48] The possessors had built structures, planted trees, and resided on the north end of the property,[49] but in the south they had only used pre-existing trails in connection with subsistence and recreation, picked up litter, and allegedly placed stakes at the corners of the claimed property.[50] Green's use of the western area of the bluff property goes beyond the use found inadequate in *Nome 2000:* She cleared a road through the woods, marked her border clearly with a chain, cleared trees, and raised poultry. Depending how far west these activities extended, they may be sufficient to support the court's award of property extending 300 feet west of the house. We remand this issue to the trial court for further findings regarding Green's actual use of that area.

### D. *Procedural Issues*

#### 1. *Admission of exhibit*

Vezey complains that, "[d]uring the course of the trial, the court, on its own motion, admitted a lien document marked Exhibit AD by the defense." Neither party had offered this exhibit into evidence, and Vezey objected to its admission at the time. Vezey argues that no case law permits a judge to admit evidence that has not been offered, and that Judge Savell's action was that of an advocate, not an impartial adjudicator.[51]

Civil Rule 43.1(c) states that "[e]xhibits properly marked for identification may be admitted into evidence upon the motion of

---

**47.** 799 P.2d 304 (Alaska 1990).

**48.** *Id.* at 310–11.

**49.** *Id.* at 310.

**50.** *Id.* at 311.

**51.** Vezey cites *Chugach Electric Ass'n v. Northern Corp.*, 562 P.2d 1053, 1061 (Alaska 1977), a case in which this court found that a trial judge abused discretion by considering *after* trial evidence that had never been introduced. Judge Savell's introduction of evidence *during* trial is clearly distinguishable.

any party or upon the court's own motion." Pursuant to this rule, Judge Savell permissibly admitted the challenged exhibit. He did not err in doing so.

### 2. Summary judgment

Prior to trial, Vezey moved for summary judgment, arguing that the statute of frauds, AS 09.25.010, barred Green from claiming title to land by oral gift. In his later reply to the opposition to motion for summary judgment, he expanded his claim to argue that because Green received the property as a gift, her possession was permissive and therefore could not be hostile. The superior court denied his motion. Vezey appeals the denial, reiterating his argument that an oral gift cannot be the predicate for an adverse possession claim. As discussed above, a gift does not prevent a donee possessor from being hostile to the donor record owner for purposes of an adverse possession claim. Therefore, we find that the superior court correctly denied Vezey's motion.

## V. CONCLUSION

Because Green has proved the elements of adverse possession, we hold that she has established title to at least part of the claimed property. The alleged parol gift of land from her grandmother does not defeat her claim, but rather strengthens it. Because Green has made the more difficult showing for ordinary adverse possession, she would also meet the lower standard for adverse possession arising from a gift. However, it is not clear that Green has demonstrated actual possession of the entire area awarded by the superior court. Although we AFFIRM the award as to the north, east, and south areas of the property, we REMAND for further findings regarding the land to the west of the house.

MATTHEWS, Justice, with whom EASTAUGH, Justice, joins, dissenting.

The principle that should govern this case is that the boundaries of property claimed by adverse possession not under color of title must be established by visible evidence of possession for the statutorily required ten-year period. The judgment of the superior court violates this principle in two ways. First, the acts that give rise to the visible evidence of possession on which the court relied to establish boundaries were carried out less than ten years before the end of the ten-year period. Second, there was no visible evidence of possession extending to the southern or western boundaries which the court ordered established. Therefore the judgment of the court must be reversed and this case should be remanded with instructions to the court to draw boundaries that are coterminous with acts creating visible evidence of possession that took place ten years or more before the end of the statutory period.

It is well established that the extent of land adversely possessed not under color of title must be defined by visible possession of the land for the statutory period.[1] The authoritative treatise *Thompson on Real Property* notes that the possession must, among other elements, be "visible" "during the time necessary to create a bar under the statute of limitations."[2] Thompson goes on to observe that

> the extent of the ground claimed must be indicated in some way and be of such character as to clearly show that such ground is claimed by the party asserting to the right thereto. There must be such marks as indicate that the land is under the actual control of the party claiming it.[3]

---

**1.** In fact the, principal feature that distinguishes color of title cases from those adverse possession cases not involving color of title—apart from the different statutory periods—is that in color of title cases the description in the document of title defines the boundaries of the property possessed, whereas in non-color of title cases boundaries are defined by the extent of the actual possession. We made this point in *Hubbard v. Curtiss*, 684 P.2d 842, 847 (Alaska 1984): "The supposed conveyance must accurately describe the land claimed and it is the description, not the physical use of the land by the claimant, that determines the boundaries of the land that may be acquired by adverse possession under color of title."

**2.** 10 *Thompson on Real Property* § 87.01, at 75 (David A. Thomas ed., 2d ed.1998).

**3.** *Id.* § 87.06, at 122.

In order to determine whether land has been adversely possessed for at least ten years there must be a date that ends the ten-year period. From this a beginning date can be calculated. Activities demonstrating possession that take place before the beginning date can serve to establish the boundaries of the adversely possessed land, but those that come after the beginning date cannot for they do not meet the ten-year requirement. In this case the superior court appears to have settled on the end of the summer of 1993 as the ending date of the ten-year period.[4] Therefore the beginning of the ten-year period was the end of the summer of 1983. Activities before then can serve as boundary markers, but activities occurring after then may not because they do not satisfy the ten-year statute.

The record shows that Green's activities on the land in 1982 consisted of clearing the pre-existing access road from the west, clearing a pre-existing trail that went to the bluff at the east of the property, and doing "some" clearing of the property. In addition Green placed a chain at some unspecified point across the road from the west and hung a "no trespassing" sign from it. In 1983 Green did "more" land clearing and sold "very small quantities" of rock from the bottom of the Shaw Creek bluff. Given an end of summer of 1993 ending date for the ten-year adverse possession period, the boundaries of the adversely possessed property must be limited to the areas encompassed by these activities.

But the trial court did not limit itself to the 1982 and 1983 activities in fixing the boundaries of the property. Instead, the court relied on clearing, construction, and gardening activities that took place in 1984 and later, even though these encompassed new land.[5] The court erred when it relied on

---

4. The court did not make formal written findings. Instead, the court's oral decision serves to meet the findings and conclusions requirement of Civil Rule 52(a). The court did not directly say that the summer of 1993 would be the end of the ten-year period, but I believe that is the import of the court's remarks:

 The boundaries of the times of evidence, with minor exception, are the periods from 1982 through the summer of 1993 and that period of time primarily is all evidence presented by the plaintiff and of events recounted by plaintiff concerning that property. I say with rare exception because with the exception of what we can call "Earthmover's evidence," there is no evidence presented by the defense that falls within the statutory period.

5. I set out here the transcript of the court's findings concerning Green's activities from 1984 through 1991.

 But continuing with the facts. In 1984, spring and summer, Ms. Green continued her activities: sleeping on the bluff in a trailer, setting it up on the bluff, clearing, hand excavation, excavation of the foundation with employees hired from the Delta area. Art McTaggart, brother or cousin James, Jeff Scully, Cummings cleared enough to be safe from fire and this—and, in this regard, I find it significant that Ms. Green dealt with public officials and, in particular, the Delta Fire Department or fire authorities that she had come up to the property to advise the necessary distance to clear trees to have a practical fire break. Trees were cut on the south and east of the property—of the house to improve her road, yet to contain—continue invisibility from the road below. The absence of heavy equipment by her wish caused the work to be longer and harder but, through use of axes, chain saws, trucks for stumps, the area of the house and, then, the back area for the drive and turnaround area was cleared. It was in these years, through the mid- and late—'80's, that the chicken and turkeys were put in coops and chicken wire on the property and, as *she expanded her activities out backwards and forwards, to clear woods of dead trees and thin the area.*

 Trees were cleared through to the telephone line which is what's commonly called the parallel east/west road to the north of the structure.

 Block work went in in 1985. A contractor was hired with whom she eventually—whose services she eventually terminated. In '85 she went in early enough to go in by snowmachine, I believe, and in, as Mr. McTaggart testified, on numerous years he would open the house after it was constructed for Ms. Green by snowmachine and close it down afterwards.

 In 1986, waiting for Mr. Cummings to continue—or to build the foundation and she eventually terminated him and hired Mutt Montgomery to build in '87. In 1986 to the summer of '87, she wintered in Fairbanks and snowmachined into the property during the winter. Construction began in 1987. In 1987 she began to live in the rough structure; worked on windows and doors, a pantry; hired a cabinet man for the kitchen in 1988. Prepare area for the propane stove, cabinet and wood stove and lived in Fairbanks in the winter of '87, visiting her property also during the winter. In 1988 the closets went in, shelving and other activities. The turkeys, as I mentioned before, were added in '88. In 1985 or 1986 a telephone was

"expanded" activities that occurred after the summer of 1983 in fixing the boundaries. The evidence of possession resulting from post–1983 activities does not meet the ten-year requirement of AS 09.10.030.

Moreover, even if all of Green's activities, no matter when they occurred, were used to measure the boundaries on the land, the west and south boundaries established by the court would still not be justified. Most of the approximately twelve acres awarded by the court lie to the south, southwest, and west of the house. Apart from the cleared area where the house sits, said to be no more than one-half of an acre, no other work was done to the southwest. To the west, all that was done was clearing the road, stretching a chain across it, and putting up a no trespassing sign. The road work can justify awarding Green an easement by prescription in the road where it crosses land not otherwise possessed by her. The clearing around the house to the south and west can justify awarding land so cleared to her. But the south and west boundaries are located hundreds of feet away from this clearing. As to the land to the south, southwest, and west between this clearing and these boundaries there is simply no evidence of visible acts of possession.

In summary, in deciding the boundaries of the land adversely possessed by Green the court impermissibly relied on activities that did not occur ten years or more before the end of the statutory period. In addition, the boundaries as set by the court encompassed much land to the south, southwest, and west that was never actually possessed by Green by any activities indicating her control, no matter when those activities might have taken place.

For these reasons I would reverse the judgment of the superior court and remand with directions to redraw the boundaries to encompass only the land that she actually possessed for the applicable ten-year period.

put in and, although in later years, there might be some uncertainty, it was listed in the directory at the time. A garden was planted, fruit

trees were planted and trees were thinned in areas that are still visible in the 1993 photo, AB. (Emphasis added.)