**NOME 2000, a limited partnership, and Robert L. Achor, Appellants,**

v.

**Charles FAGERSTROM and Peggy Fagerstrom, Appellees.**

**No. S–3409.**

Supreme Court of Alaska.

Sept. 21, 1990.

---

Constance Cates Ringstad, Paul A. Barrett, Call, Barrett & Burbank, Fairbanks, for appellants.

Jon R. Larson, Larson, Timbers & Van Winkle, Inc., Nome, for appellees.

## OPINION

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

MATTHEWS, Chief Justice.

This appeal involves a dispute over a tract of land measuring approximately seven and one-half acres, overlooking the Nome River (hereinafter the disputed parcel).[1] Record title to a tract of land known as mineral survey 1161, which includes the disputed parcel, is held by Nome 2000.

On July 24, 1987, Nome 2000 filed suit to eject Charles and Peggy Fagerstrom from the disputed parcel. The Fagerstroms counterclaimed that through their use of the parcel they had acquired title by adverse possession.

A jury trial ensued and, at the close of the Fagerstroms' case, Nome 2000 moved for a directed verdict on two grounds. First, it maintained that the Fagerstroms' evidence of use of the disputed parcel did not meet the requirements of the doctrine of adverse possession. Alternatively, Nome 2000 maintained that the requirements for adverse possession were met only as to the northerly section of the parcel and, therefore, the Fagerstroms could not have acquired title to the remain-

---

1. A diagram of the disputed parcel is attached as an appendix to this opinion.

der. The trial court denied the motion. After Nome 2000 presented its case, the jury found that the Fagerstroms had adversely possessed the entire parcel. The court then entered judgment in favor of the Fagerstroms.

On appeal, Nome 2000 contests the trial court's denial of its motion for a directed verdict and the sufficiency of the evidence in support of the jury verdict. It also challenges two evidentiary rulings made by the trial court and the trial court's award of attorney's fees to the Fagerstroms.

## I. FACTUAL BACKGROUND [2]

The disputed parcel is located in a rural area known as Osborn. During the warmer seasons, property in Osborn is suitable for homesites and subsistence and recreational activities. During the colder seasons, little or no use is made of Osborn property.

Charles Fagerstrom's earliest recollection of the disputed parcel is his family's use of it around 1944 or 1945. At that time, he and his family used an abandoned boy scout cabin present on the parcel as a subsistence base camp during summer months. Around 1947 or 1948, they moved their summer campsite to an area south of the disputed parcel. However, Charles and his family continued to make seasonal use of the disputed parcel for subsistence and recreation.

In 1963, Charles and Peggy Fagerstrom were married and, in 1966, they brought a small quantity of building materials to the north end of the disputed parcel. They intended to build a cabin.

In 1970 or 1971, the Fagerstroms used four cornerposts to stake off a twelve acre, rectangular parcel for purposes of a Native Allotment application.[3] The northeast and southeast stakes were located on or very near mineral survey 1161. The northwest and southwest stakes were located well to the west of mineral survey 1161. The overlap constitutes the disputed parcel. The southeast stake disappeared at an unknown time.

Also around 1970, the Fagerstroms built a picnic area on the north end of the disputed parcel. The area included a gravel pit, beachwood blocks as chairs, firewood and a 50–gallon barrel for use as a stove.

About mid-July 1974, the Fagerstroms placed a camper trailer on the north end of the disputed parcel. The trailer was leveled on blocks and remained in place through late September. Thereafter, until 1978, the Fagerstroms parked their camper trailer on the north end of the disputed parcel from early June through September. The camper was equipped with food, bedding, a stove and other household items.

About the same time that the Fagerstroms began parking the trailer on the disputed parcel, they built an outhouse and a fish rack on the north end of the parcel. Both fixtures remained through the time of trial in their original locations.[4] The Fagerstroms also planted some spruce trees, not indigenous to the Osborn area, in 1975–76.

During the summer of 1977, the Fagerstroms built a reindeer shelter on the north end of the disputed parcel. The shelter was about 8x8 feet wide, and tall enough for Charles Fagerstrom to stand in.

---

**2.** Because Nome 2000 challenges the trial court's denial of its motion for a directed verdict, and the sufficiency of the evidence underlying the jury verdict, we are constrained to view the evidence in a light most favorable to the Fagerstroms. *See Kavorkian v. Tommy's Elbow Room, Inc.,* 694 P.2d 160, 163 (Alaska 1985); *Levar v. Elkins,* 604 P.2d 602, 603 (Alaska 1980). Our statement of the facts is made from this viewpoint.

**3.** Federal law authorizes the Secretary of the Interior to allot certain non-mineral lands to Native Alaskans. *See* Act of May 17, 1906, 34 Stat. 197, as amended, Act of August 2, 1956, 70

Stat. 954; repealed by the Alaska Native Claims Settlement Act, § 18, with a savings clause for applications pending on December 18, 1971, 43 U.S.C. § 1617(a) (1982); modified by the Alaska National Interest Lands Conservation Act, § 905, 43 U.S.C. § 1634 (1982). As a result of her application, Peggy was awarded two lots (lots 3 and 12) which border the disputed parcel along its western boundary. (*See* Appendix.)

**4.** The outhouse was blown over one winter by strong winds, but was re-erected the following summer with additional supports.

Around the shelter, the Fagerstroms constructed a pen which was 75 feet in diameter and 5 feet high. The shelter and pen housed a reindeer for about six weeks and the pen remained in place until the summer of 1978.

During their testimony, the Fagerstroms estimated that they were personally present on the disputed parcel from 1974 through 1978, "every other weekend or so" and "[a] couple times during the week ... if the weather was good." When present they used the north end of the parcel as a base camp while using the entire parcel for subsistence and recreational purposes. Their activities included gathering berries, catching and drying fish and picnicking. Their children played on the parcel. The Fagerstroms also kept the property clean, picking up litter left by others.

While so using the disputed parcel, the Fagerstroms walked along various paths which traverse the entire parcel. The paths were present prior to the Fagerstroms' use of the parcel and, according to Peggy Fagerstrom, were free for use by others in connection with picking berries and fishing. On one occasion, however, Charles Fagerstrom excluded campers from the land. They were burning the Fagerstroms' firewood.

Nome 2000 placed into evidence the deposition testimony of Dr. Steven McNabb, an expert in anthropology, who stated that the Fagerstroms' use of the disputed parcel was consistent with the traditional Native Alaskan system of land use. According to McNabb, unlike the non-Native system, the traditional Native system does not recognize exclusive ownership of land. Instead, customary use of land, such as the Fagerstroms' use of the disputed parcel, establishes only a first priority claim to the land's resources. The claim is not exclusive and is not a matter of ownership, but is more in the nature of a stewardship. That is, other members of the claimant's social group may share in the resources of the land without obtaining permission, so long as the resources are not abused or destroyed. McNabb explained that Charles' exclusion of the campers from the land was a response to the campers' use of the Fagerstroms' personal property (their firewood), not a response to an invasion of a perceived real property interest.[5]

Nevertheless, several persons from the community testified that the Fagerstroms' use of the property from 1974 through 1977 was consistent with that of an owner of the property. For example, one Nome resident testified that since 1974 "[the Fagerstroms] cared for [the disputed parcel] as if they owned it. They made improvements on it as if they owned it. It was my belief that they did own it."

During the summer of 1978, the Fagerstroms put a cabin on the north end of the disputed parcel. Nome 2000 admits that from the time that the cabin was so placed until the time that Nome 2000 filed this suit, the Fagerstroms adversely possessed the north end of the disputed parcel. Nome 2000 filed its complaint on July 24, 1987.

## II. DISCUSSION

### A.

The Fagerstroms' claim of title by adverse possession is governed by AS 09.-10.030, which provides for a ten-year limitations period for actions to recover real property.[6] Thus, if the Fagerstroms adversely possessed the disputed parcel, or any portion thereof, for ten consecutive years, then they have acquired title to that property. See *Hubbard v. Curtiss*, 684 P.2d 842, 849 (Alaska 1984) ("[T]itle automatically vests in the adverse possessor at the end of the statutory period."). Because the Fagerstroms' use of the parcel increased over the years, and because Nome

5. However, Charles Fagerstrom testified that when he excluded the campers he felt that they were "on our property." He also testified that during the mid to late 70's he would have "frown[ed]" upon people camping on "my property."

6. A seven-year period is provided for by AS 09.25.050 when possession is under "color and claim of title." The Fagerstroms do not maintain that their possession was under color of title.

2000 filed its complaint on July 24, 1987, the relevant period is July 24, 1977 through July 24, 1987.

We recently described the elements of adverse possession as follows: "In order to acquire title by adverse possession, the claimant must prove, by clear and convincing evidence, ... that for the statutory period 'his use of the land was continuous, open and notorious, exclusive and hostile to the true owner.'" *Smith v. Krebs*, 768 P.2d 124, 125 (Alaska 1989) (citations omitted). The first three conditions—continuity, notoriety and exclusivity—describe the physical requirements of the doctrine. *See* R. Cunningham, W. Stoebuck and D. Whitman, *The Law of Property* § 11.7 at 758–60, 762–63 (1984). The fourth condition, hostility, is often imprecisely described as the "intent" requirement. *Id.* at 761.

On appeal, Nome 2000 argues that as a matter of law the physical requirements are not met absent "significant physical improvements" or "substantial activity" on the land. Thus, according to Nome 2000, only when the Fagerstroms placed a cabin on the disputed parcel in the summer of 1978 did their possession become adverse. For the prior year, so the argument goes, the Fagerstroms' physical use of the property was insufficient because they did not construct "significant structure[s]" and their use was only seasonal. Nome 2000 also argues that the Fagerstroms' use of the disputed parcel was not exclusive because "[o]thers were free to pick the berries, use the paths and fish in the area." We reject these arguments.

 Whether a claimant's physical acts upon the land are sufficiently continuous, notorious and exclusive does not necessarily depend on the existence of significant improvements, substantial activity or absolute exclusivity. Indeed, this area of law is not susceptible to fixed standards because the quality and quantity of acts required for adverse possession depend on the *character* of the land in question. Thus, the conditions of continuity and ex-

clusivity require only that the land be used for the statutory period as an average owner of similar property would use it. *Alaska National Bank v. Linck*, 559 P.2d 1049, 1052 (Alaska 1977) (One test for determining continuity of possession is to ask whether the land was used as an average owner would use it.); *Peters v. Juneau–Douglas Girl Scout Council*, 519 P.2d 826, 831 (Alaska 1974) ("[P]ossession need not be absolutely exclusive; it need only be a type of possession which would characterize an owner's use."). Where, as in the present case, the land is rural, a lesser exercise of dominion and control may be reasonable. *See Linck*, 559 P.2d at 1052 (citing *Cooper v. Carter Oil Co.*, 7 Utah 2d 9, 316 P.2d 320 (1957) for the proposition that "pasturing of sheep for three weeks a year is sufficient where land is suitable only for grazing"), 1053 (citing *Monroe v. Rawlings*, 331 Mich. 49, 49 N.W.2d 55, 56 (1951) for the proposition that "6 visits per year to hunting cabin plus some timber cutting found sufficient where land was wild and undeveloped"); *Peters*, 519 P.2d at 831 (citing *Pulcifer v. Bishop*, 246 Mich. 579, 225 N.W. 3 (1929) for the proposition that exclusivity is not destroyed as to beach property commonly used by others).

 The character of the land in question is also relevant to the notoriety requirement. Use consistent with ownership which gives visible evidence of the claimant's possession, such that the reasonably diligent owner "could see that a hostile flag was being flown over his property," is sufficient. *Shilts v. Young*, 567 P.2d 769, 776 (Alaska 1977). Where physical visibility is established, community repute is also relevant evidence that the true owner was put on notice.[7] *Id.*

 Applying the foregoing principles to this case, we hold that the jury could reasonably conclude that the Fagerstroms established, by clear and convincing evidence, continuous, notorious and exclusive possession for ten years prior to the date Nome

---

7. The function of the notoriety requirement is to afford the true owner an opportunity for notice. However, actual notice is not required; the true owner is charged with knowing what a reasonably diligent owner would have known. *Linck*, 559 P.2d at 1053.

2000 filed suit.[8] We point out that we are concerned only with the first year, the summer of 1977 through the summer of 1978, as Nome 2000 admits that the requirements of adverse possession were met from the summer of 1978 through the summer of 1987.

The disputed parcel is located in a rural area suitable as a seasonal homesite for subsistence and recreational activities. This is exactly how the Fagerstroms used it during the year in question. On the premises throughout the entire year were an outhouse, a fish rack, a large reindeer pen (which, for six weeks, housed a reindeer), a picnic area, a small quantity of building materials and some trees not indigenous to the area. During the warmer season, for about 13 weeks, the Fagerstroms also placed a camper trailer on blocks on the disputed parcel. The Fagerstroms and their children visited the property several times during the warmer season to fish, gather berries, clean the premises, and play. In total, their conduct and improvements went well beyond "mere casual and occasional trespasses" and instead "evince[d] a purpose to exercise exclusive dominion over the property." *See Peters,* 519 P.2d at 830. That others were free to pick berries and fish is consistent with the conduct of a hospitable landowner, and undermines neither the continuity nor exclusivity of their possession. *See id.* at 831 (claimant "merely acting as any other hospitable landowner might" in allowing strangers to come on land to dig clams).

With respect to the notoriety requirement, a quick investigation of the premises, especially during the season which it was best suited for use, would have been sufficient to place a reasonably diligent landowner on notice that someone may have been exercising dominion and control over at least the northern portion of the property. Upon such notice, further inquiry would indicate that members of the community regarded the Fagerstroms as the owners. Continuous, exclusive, and notorious possession were thus established.

█ Nome 2000 also argues that the Fagerstroms did not establish hostility. It claims that "the Fagerstroms were required to prove that they intended to claim the property as their own." According to Nome 2000, this intent was lacking as the Fagerstroms thought of themselves not as owners but as stewards pursuant to the traditional system of Native Alaskan land usage. We reject this argument and hold that all of the elements of adverse possession were met.

█ What the Fagerstroms believed or intended has nothing to do with the question whether their possession was hostile. *See Peters,* 519 P.2d at 832 (with respect to the requirement of hostility, the possessor's "beliefs as to the true legal ownership of the land, his good faith or bad faith in entering into possession ... are all irrelevant."); *The Law of Property* at 761 (citing, *inter alia, Peters* for the view "of most decisions and of nearly all scholars, that what the possessor believes or intends should have nothing to do with [hostility]"). Hostility is instead determined by application of an *objective* test which simply asks whether the possessor "acted toward the land as if he owned it," without the permission of one with legal authority to give possession. *Hubbard,* 684 P.2d at 848 (citing *Peters,* 519 P.2d at 832). As indicated, the Fagerstroms' actions toward the property were consistent with ownership of it, and Nome 2000 offers no proof that the Fagerstroms so acted with anyone's permission. That the Fagerstroms' objective manifestations of ownership may have been accompanied by what was described as a traditional Native Alaskan mind-set is irrelevant. To hold otherwise would be inconsistent with precedent and patently unfair.

█ Having concluded that the Fagerstroms established the elements of adverse possession, we turn to the question wheth-

---

**8.** Neither the trial court's denial of Nome 2000's motion for a directed verdict nor the jury's verdict should be disturbed if reasonable jurors could have concluded that the requirements for adverse possession were met. *See Kavorkian,* 694 P.2d at 163; *Municipality of Anchorage v. Baugh Construction & Engineering Co.,* 722 P.2d 919, 927 (Alaska 1986).

er they were entitled to the entire disputed parcel. Specifically, the question presented is whether the jury could reasonably conclude that the Fagerstroms adversely possessed the southerly portion of the disputed parcel.[9]

■ Absent color of title,[10] only property actually possessed may be acquired by adverse possession. *Bentley Family Trust v. Lynx Enterprises, Inc.*, 658 P.2d 761, 768 (Alaska 1983) and *Linck*, 559 P.2d at 1052–53 n. 8. *See also Krebs*, 768 P.2d at 126 and n. 7 (recognizing the possibility that the requirements of adverse possession may be met only as to a portion of a disputed parcel). Here, from the summer of 1977 through the summer of 1978, the Fagerstroms' only activity on the southerly portion of the land included use of the pre-existing trails in connection with subsistence and recreational activities, and picking up litter. They claim that these activities, together with their placement of the cornerposts, constituted actual possession of the southerly portion of the parcel. Nome 2000 argues that this activity did not constitute actual possession and, at most, entitled the Fagerstroms to an easement by prescription across the southerly portion of the disputed parcel.

Nome 2000 is correct. The Fagerstroms' use of the trails and picking up of litter, although perhaps indicative of adverse use, would not provide the reasonably diligent owner with visible evidence of another's exercise of dominion and control. To this, the cornerposts add virtually nothing. Two of the four posts are located well to the west of the disputed parcel. Of the two that were allegedly placed on the parcel in 1970, the one located on the southerly portion of the parcel disappeared at an unknown time. The Fagerstroms maintain that because the disappearing stake was securely in place in 1970, we should infer that it remained for a "significant period." Even if we draw this inference, we fail to

see how two posts on a rectangular parcel of property can, as the Fagerstroms put it, constitute "[t]he objective act of taking physical possession" of the parcel. The two posts simply do not serve to mark off the boundaries of the disputed parcel and, therefore, do not evince an exercise of dominion and control over the entire parcel. Thus, we conclude that the superior court erred in its denial of Nome 2000's motion for a directed verdict as to the southerly portion. This case is remanded to the trial court, with instructions to determine the extent of the Fagerstroms' acquisition in a manner consistent with this opinion.

### B.

■ At trial, certain records from the United States Department of the Interior, Bureau of Land Management (BLM), were admitted into evidence over Nome 2000's hearsay objection. On appeal, Nome 2000 claims that admission of the records was prejudicial error because "[o]ther than the Fagerstroms' own self-serving testimony, the BLM file contained the only evidence that the Fagerstroms had placed two stakes on [the disputed parcel].... in 1970...."

■ Our reversal of the award of title to the southerly portion of the disputed parcel renders moot Nome 2000's allegation that the BLM records may have improperly influenced the jury's finding of a stake on that portion of the parcel. Insofar as we affirm the award of title to the northerly section, we believe that any improper evidence as to the existence of a post on that section of the land was not prejudicial; disregarding the post, the evidence amply supports a finding of adverse possession of the northerly section of the parcel. *See Fairbanks North Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1035 (Alaska 1986) (erroneous admission of

9. *See supra* n. 8.

10. "Color of title exists only by virtue of a written instrument which purports to pass title to the claimant, but which is ineffective because of a defect in the means of conveyance or because

the grantor did not actually own the land he sought to convey." *Hubbard*, 684 P.2d at 847. As noted above, *see* n. 6, the Fagerstroms do not claim the disputed parcel by virtue of a written instrument.

cumulative evidence is not prejudicial); Alaska Civ.R. 61.

■ Nome 2000 also challenges the trial court's decision to exclude a photograph of the disputed parcel sought to be introduced into evidence by Nome 2000. The trial court ruled that Nome 2000 had improperly withheld the photograph prior to trial in light of the Fagerstroms' discovery requests. On appeal, Nome 2000 argues that the photograph was "essential" to its case because it showed that some of the paths on the disputed parcel were nearly invisible and, therefore, tended to rebut the Fagerstroms' assertion of notorious possession.

Based on our review of the record, we conclude that the photograph was not at all essential to Nome 2000's case, and that if an error was committed by exclusion it was harmless. In fact, before the trial court, Nome 2000's attorney argued that the photograph was largely cumulative, and therefore the Fagerstroms were not prejudiced by Nome 2000's non-production:

> I don't think there's any prejudice from the non-production.... [T]he photograph ... is *consistent with the aerial photographs.* What I intend to ask Mr. Fagerstrom is, if this [photograph] doesn't *confirm* what he said about the trails near the rock being nearly invisible. And *it gives a photographic representation to what he's already testified to* .... And I think it's the only photograph that shows the privy, for example. I would think [the Fagerstroms would] like that.

(Emphasis added.) *See Sloan v. Atlantic Richfield Co.*, 541 P.2d 717, 722 n. 7 (Alaska 1975) (erroneous exclusion of cumulative evidence is not prejudicial); Alaska Civ.R. 61.

## C.

■ Pursuant to Civil Rule 82, the trial court awarded the Fagerstroms $7,750.00 as partial compensation for actual attorney's fees incurred. Nome 2000 argues that an award of attorney's fees to an adverse possessor amounts to a "windfall," and should not be given because the record owner is defending an "important" right, namely, its legal title to the disputed parcel. In support of this position, Nome 2000 relies on *Sjong v. State, Dep't of Revenue*, 622 P.2d 967 (Alaska 1981).

In *Sjong* we stated that an award of attorney's fees may be inappropriate where the losing party was defending an important right; e.g., where a teacher who, in defense of his professional reputation, unsuccessfully appeals to the superior court a school board's decision to dismiss him. *Id.* at 978–979 (explaining *Crisp v. Kenai Peninsula Borough School District*, 587 P.2d 1168 (Alaska 1978)).[11] However, in *Rosen v. State Board of Public Accountancy*, 689 P.2d 478, 482 (Alaska 1984), we stated that the importance of the right is only one factor bearing upon the sound discretion of the trial judge when deciding whether to award attorney's fees in any given case. We rejected the dispositive significance given the importance-of-the-right criteria by *Crisp* and *Sjong*, reasoning that "[t]he importance of the right asserted is frequently very subjective, and it does not lend itself to quantification in absolute terms." *Id.*[12]

Here, the trial judge specifically considered Nome 2000's argument based on *Sjong*, as well as the duration, complexity and costs of trial court proceedings, and did "not find cause to exercise the court's discretion in not awarding any attorney's fees to the prevailing parties." We do not believe that this determination constituted an abuse of discretion. This is not a situation, to use the language of *S.O. v. W.S.*, "in which the 'equities of the situation' ... make an award of substantial attorney's

---

11. *See also, S.O. v. W.S.*, 643 P.2d 997, 1007 (Alaska 1982), where we relied on the importance-of-the-right rationale from *Crisp* and *Sjong* to reverse an award of attorney's fees entered against a parent who unsuccessfully attempted to revoke her consent to an adoption of her natural child.

12. *Rosen* involved an award of attorney's fees under Appellate Rule 508(e), but its rationale applies with equal force to an award based on Civil Rule 82. *See* 689 P.2d at 481 and n. 4–5.

fees manifestly unreasonable." 643 P.2d at 1007 (quoting *Cooper v. Carlson,* 511 P.2d 1305, 1311 (Alaska 1973)). The Fagerstroms spent many years perfecting title to a substantial portion of the disputed parcel. It appears that they have come to rely on their use of the parcel. The Fagerstroms' recovery of attorney's fees is therefore no more a "windfall" than would be the case had Nome 2000 prevailed and obtained an attorney's fees award.

Nonetheless, in view of our decision on the merits of this case, we are vacating the award of attorney's fees. On remand, after the trial court decides the boundaries of the Fagerstroms' property, the court should decide which party is the prevailing party and make an award accordingly. Civ.R. 82.

Affirmed in part, reversed in part, and remanded.

APPENDIX

N

• stake #3

3

S88°57'E 288.71' • stake #4

6

LEGEND :
1) Abandoned Boy Scout cabin
2) Building Materials
3) Picnic area
4) Camper trailer
5) Outhouse
6) Fish rack
7) Reindeer pen
8) Non-indigenous spruce trees

8

4

5

7

2

LOT 3

S1°03'W(R) 745.80'

N1°03'E(M) 685.63'

Nome River

S0°33'E 826 77'

WEST 1031 58'

291.06'

foot trails

NORTH 597 69'

654 72'(R)

440.75'(M)

1

LOT 12

S13°23'W 306.06'

stake #2

N0°50'E(M) 214 17'

N89°10'W 244.75' • stake #1

Osborn Rd.