**Allen VEZEY, Appellant,**

v.

**Angela GREEN, Appellee.**

No. S–11353.

Supreme Court of Alaska.

Nov. 16, 2007.

John J. Connors, Law Office of John J. Connors, PC, Fairbanks, for Appellant.

Joe P. Josephson, Josephson & Associates, PC, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

PER CURIAM.

## I. INTRODUCTION

In an earlier decision on appeal in this case, we concluded that Angela Green had established title by adverse possession to land to the north, south, and east of a cabin she had built near Fairbanks, but we remanded the issue of the extent to which she had adversely possessed land to the west of her cabin. On remand, the superior court determined that Green had acquired title to all of the land up to 300 feet west of her cabin primarily because she had cleared and improved a western trail leading to the property.

Allen Vezey appeals this determination, raising two claims. First, he argues that the trial court erred in denying his Alaska Civil Rule 60(b) motion to set aside its original judgment, in which he claimed that his discovery of new aerial photographs and alleged misrepresentations by Green to one of the owners of the property justified vacating the original judgment. Second, he contends that the superior court erred in concluding that Green proved that she had adversely possessed the land to the west of her cabin. Because the Rule 60(b) motion was not timely, we affirm the superior court's decision on that issue. However, because the evidence only supports granting Green the land forty feet to the west of her cabin, we reverse the decision of the superior court awarding Green all land up to 300 feet west of the cabin.

## II. FACTS AND PROCEEDINGS

The underlying facts of this case are set out in our earlier decision, *Vezey v. Green* (*Vezey I* ).[1] In brief, in 1982 Angela Green's grandmother, Billie Harrild, gave Green a piece of the family's land on Shaw Creek Bluff. The gift was not recorded. Between 1982 and the mid–1990s, Green constructed a cabin and cultivated grounds on the property. In the winter of 1994–1995, Allen Vezey bought a two-thirds interest in a parcel of land that included Green's property.[2] After Vezey purchased the property, Green brought suit to establish her right to a portion of the land. She sued Vezey, the estates of Billie Harrild and Billie's husband, Elden, as well as Billie and Elden's son, John, who owned the remaining one-third interest. Only Vezey defended. Green maintained that Billie Harrild had orally promised her the property to build a cabin and that Green had acquired title over the property by adverse possession, having made open and exclusive use of the land since 1982 that included clearing the land, building a cabin, and making other improvements to the property.[3]

At the first trial in 1999, the superior court held that Green had acquired title to the entire bluff area, noting that Green had proven use of the land from 1982 until 1993.[4] The superior court concluded that the relevant parcel was roughly rectangular, and was bounded by the lot boundary to the north, Old Richardson Highway to the south, Shaw Creek to the east, and a line 300 feet from the cabin to the west. Vezey appealed, and we affirmed in every respect except one: We remanded for further findings on the extent of Green's possession of the property to the west of her cabin.[5] In considering Green's adverse possession claim, we examined the period between the summer of 1983 and the summer of 1993 because it was during this time span that "Green presented the most evidence of consistent use." [6]

On remand, Vezey moved for relief from the original trial judgment under Alaska Civil Rule 60(b)(2) and (3). Vezey's Rule 60(b)(2) argument was based on "newly discovered" photographic evidence which, according to Vezey, belied Green's testimony and demonstrated that she had not made sufficient use of the land during the prescriptive period. Vezey's Rule 60(b)(3) argument contended that Green had misled John Har-

---

1. 35 P.3d 14, 18–19 (Alaska 2001).

2. *Id.* at 19.

3. *Id.*

4. *Id.* at 20.

5. *Id.* at 28.

6. *Id.* at 20.

rild about the size of her claim when she asked him to sign an "appearance and waiver" in her first action. In a one-page order, the superior court rejected Vezey's motion on the ground that Green's opposition created "[g]ood cause" to do so. Vezey appeals this decision.

Following the second trial in 2003, the superior court determined that Green had proven that she had adversely possessed the entire western section of the property. The superior court began by noting that its inquiry was limited to determining the western boundary of Green's claim. It found that in 1982 Green started renovating the westerly trail by creating a turnaround for cars and clearing away underbrush and larger trees. The court also determined that Green and her friends and employees had used and cleared the western trail from 1982 onwards and noted that her use of the access trail predated her use of the land on which she built her cabin.

The superior court discounted the testimony of Raymond Kreig, Vezey's photographic expert, who testified that clearing of the trail was not apparent before 1986 because Kreig admitted that improvements visible on the ground might not be visible in the photos. Instead, the court credited the testimony of Green and other witnesses that the trail had been improved in 1982 and 1983.

The superior court also found that Green had placed chains or cables at the end of her western access road: she placed one cable at the end of the road where it connected to the telephone road, one on the trail roughly 300 feet west of her cabin, and one near her house. The court noted that two of Green's neighbors testified to seeing chains and flagging tape at various places and that one of them stated that she understood the flagging to show that the property belonged to Green. The court also noted that this witness testified that she had seen the flagging two to three years before Green's cabin was constructed.

While the superior court found that Green had made use of the land west of her cabin by putting a chain over the entrance to the renovated trail to the bluff, planting trees in the area, and keeping turkeys and chickens there, it declined to factor these activities into the adverse possession analysis because they occurred after 1983. Furthermore, the court recognized that Green's testimony at the 2003 trial differed in some respects from her 1999 testimony: Green gave differing dates for when she placed her camper on the site and could not recall selling rock from the land prior to 1985. But the court did not accord these discrepancies any legal effect because they were relevant only to portions of the property outside our remand order. It reasoned that these discrepancies went to findings that were unassailable because the status of everything other than the western portion of the property had been settled by our affirmance of the superior court's 1999 decision on those issues.

Finally, the court concluded that Green had established by clear and convincing evidence that her widening, clearing, and continual use of the trail supported her adverse possession claim to the entire portion of land 300 feet to the west of her cabin. Vezey appeals.

## III. STANDARD OF REVIEW

■ Denial of a Civil Rule 60(b) motion is reviewed for abuse of discretion.[7] We will conclude that a court has abused its discretion only if we come to the "definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling."[8]

■ The trial court's factual findings are reviewed for clear error[9] and are rejected only when we are "left with a definite and firm conviction on the entire record that a mistake has been committed."[10] Further, we grant especially strong deference to a trial court's factual findings when

---

7. *Sengupta v. Univ. of Alaska,* 21 P.3d 1240, 1248 (Alaska 2001).

8. *Id.* (quoting *Buster v. Gale,* 866 P.2d 837, 841 n. 9 (Alaska 1994)).

9. *Vezey I,* 35 P.3d at 19–20.

10. *Id.* at 20 (quoting *Alaska Foods, Inc. v. Am. Mfrs. Mut. Ins. Co.,* 482 P.2d 842, 848 (Alaska 1971)).

the findings require weighing the credibility of witnesses and conflicting oral testimony.[11] However, the trial court's legal analysis is reviewed de novo,[12] and in answering legal questions we apply "the rule of law that is most persuasive in light of precedent, reason, and policy."[13]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion in Denying Vezey's Civil Rule 60(b) Motion.

■ Vezey renews his Civil Rule 60(b) arguments on appeal, arguing that the trial court abused its discretion in denying his motion and failing to grant him relief from the 1999 judgment. However, we need not reach the merits of Vezey's claim because his motion was untimely. Alaska Civil Rule 60(b) requires that motions claiming relief under Rule 60(b)(1), (2), and (3) be filed within one year of final judgment. Although the final order challenged by Vezey was filed in November 1999, Vezey's Rule 60(b) motion was not filed until August 2002. Vezey seems to argue either that he is exempt from the one-year requirement or that it was somehow tolled during his appeal of the first judgment, and he notes that he filed his Rule 60(b) motion within one year of our decision on the appeal. However, in *Farrell v. Dome Laboratories, Inc.,*[14] we noted that courts may not expand the one-year period for Rule 60(b)(1)-(3) motions,[15] and held that "the pendency of an appeal does not extend the one-year limit under any of the first three clauses of Rule 60(b)."[16] Accordingly, we determined in *Farrell* that a Rule 60(b) motion was untimely because it was filed more than one year after the original judgment.[17] Because the rule in *Farrell* is applicable to this case and because Vezey offers no substantive reason why his untimely motion should be accepted,[18] we decline to reach the merits of Vezey's Rule 60(b) arguments and conclude that the superior court did not abuse its discretion in denying his motion.

### B. It Was Error To Determine that Green Acquired Title to Land 300 Feet West of Her Cabin by Adverse Possession.

■ To prove adverse possession Green must show that she possessed the land for ten consecutive years.[19] To acquire title by adverse possession, she must provide clear and convincing evidence that she used the land for the statutory period in a "continuous, open and notorious" manner that was

11. *Id.*

12. *Id.*

13. *Id.* (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

14. 650 P.2d 380 (Alaska 1982).

15. *Id.* at 384. Alaska Civil Rule 6(b) explicitly denies courts the ability to enlarge Rule 60(b)'s one-year period:

 Enlargement. When by these rules or by a notice given thereunder or by order of the court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order or (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect; but it may not extend the time for taking any action under Rules 50(b), 52(b), 59(b), and (e) and (f), and 60(b), except

to the extent and under the conditions stated in them.

16. *Farrell*, 650 P.2d at 384 (citing 7 J. Moore, J. Lucas & J. Wicker, Moore's Federal Practice ¶ 60.28[2], at 397–400 (1979) and 11 C. Wright & A. Miller, Federal Practice and Procedure § 2866, at 233 (1973)).

17. *Farrell*, 650 P.2d at 384.

18. Subsection (6) of Civil Rule 60(b) does allow for some claims to be brought after one year. However, to prevent parties from effectively eliminating the one-year limit for sections (1), (2), and (3), courts decline (b)(6) relief where the reasons for relief could also fall under these subsections. *Lacher v. Lacher*, 993 P.2d 413, 419 (Alaska 1999) ("[a] party can invoke subsection (b)(6) only if none of the other five clauses apply and extraordinary circumstances exist"); 11 C. Wright, A. Miller, M. Kane, Federal Practice and Procedure § 2864, at 357 (1995). We do not consider whether this case involved extraordinary circumstances because Vezey does not raise the issue or rely upon Civil Rule 60(b)(6).

19. AS 09.10.030(a).

"exclusive and hostile to the true owner." [20] In determining whether a party's use was continuous, open and notorious, and sufficiently exclusive, we apply a "flexible standard" that takes into account Alaska's geography and climate and the character of the land in question.[21] Our inquiry into these separate requirements involves some overlap because these requirements all serve the same goal of putting the record owner on notice of the existence of an adverse claimant.[22]

■ Vezey argues that Green did not prove by clear and convincing evidence that she used the property for the statutory period. However, much of his briefing addresses portions of the property not subject to the remand order: Vezey reargues issues previously decided by the trial court in 1999 and affirmed by this court in our previous decision.[23] Because the remand order only directed the superior court to make determinations regarding Green's adverse possession of property to the west of her cabin,[24] we discuss only those arguments that deal with this portion of the property.

Vezey claims that Green did not make significant improvements to the western property before September 1984. Thus, Vezey challenges Green's possession of the western property, arguing that her claim must fail because she failed to use and possess the property continuously during the ten-year period between 1983 and 1993, referenced in our prior decision.[25] Vezey relies on our statement that "[w]hile evidence from later years is relevant to continuity of use, the adverse possessor may not rely on evidence from later years to expand the boundaries of her claim." [26] His argument is that there is insufficient evidence in the record to support a conclusion that Green used all of the land west of her cabin for ten years.

Because Vezey purchased an interest in the land "in the winter of 1994–1995," [27] adverse possession cannot be established by uses of the land beginning after the winter of 1984–1985.[28] And in order to gain title to any of the western land at issue, Green must show actual possession of the area awarded.[29] As this is not a color of title case, Green cannot gain possession of the entire western land simply by possession of some portion of the land.[30] Green can therefore only gain title to land which she possessed in a "continuous, open and notorious" manner during the relevant statutory period.[31] Although the trial court found that Green had acquired title to the entire western parcel, land that extends 300 feet west of her cabin, a careful review of

20. *Vezey I*, 35 P.3d at 20 (quoting *Nome 2000 v. Fagerstrom*, 799 P.2d 304, 309 (Alaska 1990)).

21. *Id.* at 21.

22. See *Peters v. Juneau–Douglas Girl Scout Council*, 519 P.2d 826, 830 (Alaska 1974).

23. Vezey argues that his new evidence demonstrates that Green's use of property, including her clearing of the trail, was not sufficiently obvious to provide notice to the record owners. However, we already noted that the Harrilds had actual notice of Green's use and possession of the property. *Vezey I*, 35 P.3d at 22. Vezey also suggests that Green's use of the property was insufficiently continuous given that she was absent for much of the year. We already decided this issue as well and held that the land was suited to seasonal use. *Id.* at 21–22.

24. See *Wolff v. Arctic Bowl, Inc.*, 560 P.2d 758, 763 (Alaska 1977) ("The doctrine of the law of the case prohibits the reconsideration of issues which have been adjudicated in a previous appeal in the same case."). Law of the case is a policy-based doctrine that prevents relitigation of already decided issues. *Id.* at 763 n. 5. We see no reason to depart from this doctrine in this case.

25. *Vezey I*, 35 P.3d at 20.

26. *Id.* at 25.

27. *Id.* at 19.

28. AS 09.10.030. The statute provides, in relevant part: "An action may not be maintained under this subsection for the recovery [of real property] unless it appears that the plaintiff, an ancestor, a predecessor, or the grantor of the plaintiff was seized or possessed of the premises in question within 10 years before the commencement of the action."

29. *Vezey I*, 35 P.3d at 24–25.

30. *Nome 2000 v. Fagerstrom*, 799 P.2d 304, 311 (Alaska 1990) ("Absent color of title, only property actually possessed may be acquired by adverse possession." (internal citation omitted)).

31. *Vezey I*, 35 P.3d at 20.

the evidence presented to the trial court only supports a finding that Green has acquired title to land forty feet west of her cabin.

 Green testified that in 1983 she began clearing out the smaller trees and underbrush in the woods to the west of the cabin site for aesthetic and fire safety reasons; she noted that she wanted to clean up the land but did not wish to take it too far from its natural state. We consider the natural characteristics of the land when determining whether a party's use of the land was sufficient to establish adverse possession[32] and conclude that Green's use comports with the sort of use a reasonable owner would make of a wooded area on the outskirts of her property.[33] The improvements that Green made before the winter of 1984–1985[34] included making space for a cabin and clearing an area twenty feet to the west of the cabin site. Her use of the land therefore establishes title to the cabin site and the land twenty feet to the west of it. Green cleared an additional twenty-foot portion at the recommendation of the fire department, "either in '84 or '85," according to Green's testimony on remand.[35] The addition of this evidence is sufficient to establish Green's claim to the land forty feet to the west of the cabin, but not to the rest of the land 300 feet west of the cabin. Notably, Green testified that even by 1988 she had only cleared some seventy-five feet to the west of her cabin.

Two of Green's neighbors, Jan Fairbanks and William Ridder, testified that they saw flagging along the western edge of Green's property. Fairbanks testified that she would drive dogsleds through the area along the western boundary in 1982, 1983, and 1984,

and recalled seeing flagging at the entrance to the renovated trail. The superior court described Fairbanks's testimony as stating that she first saw the flagging two to three years before the cabin was built. Ridder also testified to seeing flagging "[a]ll through the woods" along what he deemed to be the "property line." However, the area where Fairbanks indicated she saw the flagging was to the west of the 300–foot boundary line. And Ridder's testimony was inconclusive as to where and when he saw the flagging. Ridder testified:

Q Okay. Where did you recall seeing a flagging of a tree?

A All through the woods. You asked me if I've ever seen a flag on a tree, and I said, oh, yeah, lots. And here I don't recollect seeing any—oh, there might have been some flags along here, maybe through here. It's hard for me, just . . . .

Q For the record, when you say maybe through there, what are you talking about?

A Property line.

Because Ridder indicated that he believed the property line to be west of the 300—foot boundary, his testimony is inconclusive and does not establish that Green flagged her western boundary.

 Green's own testimony as to the flagging is also inconclusive. Green testified that she hired a surveyor in 1984 but that he never finished the survey. In the 1999 trial, Green testified:

Q So is it—did you ever go out and say, "Okay. I'm going to plot out the areas of

---

**32.** *Nome 2000,* 799 P.2d at 309.

**33.** In *Vezey I,* we noted that we have previously cited with approval a Michigan case where regular visits and some timber cutting were found to be sufficient to establish adverse possession over wild and undeveloped property. 35 P.3d at 21 (discussing *Monroe v. Rawlings,* 331 Mich. 49, 49 N.W.2d 55, 56 (1951)).

**34.** In our prior decision, we used 1983–1993 as the statutory period for determining whether Green had acquired title by adverse possession. *Vezey I,* 35 P.3d at 20. However, improvements made in 1984 still support Green's adverse possession claim because Green can establish ad-

verse possession by showing use of the western property for the ten-year period between 1984 and 1994. At the 1999 trial she testified that she visited the bluff and the house for a week in 1994, thus demonstrating use and possession, and Vezey did not have a claim on the land until December 1994, when he purchased a warranty deed from Elden Harrild. Thus, Green is not limited to proving use between 1983–1993; she can also demonstrate her adverse possession claim using the 1984–1994 period.

**35.** In order to improve her view, Green subsequently cleared trees approximately eighty feet to the west of the cabin site, but neither party alleges that this clearing occurred before 1985.

my land where I went out to the outhouse, where I put the chicken coop...."

A I marked it. I flagged it. I walked with [the surveyor].

It is not clear what Green was referring to when she said she flagged "it." Green did testify to walking out on the property after the original action was filed "to look for the flags that had been put up on the Dora Robinson side, on the west side." But there is no evidence about when the flags were put up or by whom. Vezey testified that he had put flagging on what he thought was the boundary of his property in 1993 when he bought the Carter property. The testimony as to the flagging is thus inconclusive. However, even if Green had put up flagging along the line 300 feet to the west of her cabin, this act alone is not enough to establish her ownership of the entire parcel 300 feet to the west of her cabin. As we stated in *Vezey I,* "[e]vidence of actual possession must be sufficient to alert a reasonably diligent owner to the possessor's exercise of dominion and control. Visible evidence of use, such as occupation, fencing, and construction of permanent improvements, provides particularly compelling evidence of actual possession." [36] Flagging is a non-permanent marker and without more permanent indications of use, such as clearing of land or erecting permanent improvements, the flagging alone is not sufficient to support finding a boundary line 300 feet to the west of Green's cabin. For these reasons, we conclude that the evidence at trial supports only the conclusion that Green established possession of the land forty feet west of her cabin.

### C. Green's Fee Simple Interest in the Trail Is Limited.

Vezey also maintains that there is insufficient evidence to support the superior court's determination that Green established title to the trail. The superior court found that Green's use of the trail began in 1982, when she and her friends and employees "widened the trail, cut saplings, and cleared a turnout about one-fourth of the way in." Both Green and one of her associates, John McTaggert, testified that they widened the trail and created the turnaround, and the court noted that Green's and McTaggert's testimony was "substantially similar" on this issue.

Vezey attacks Green's and McTaggert's testimony on credibility grounds, pointing to discrepancies in Green's testimony and the fact that McTaggert took medication for memory problems. But these questions involve the credibility of witnesses and interpretations of their testimony, and the superior court's factual findings based on this testimony do not give rise to a firm and definite conviction that the trial court made a mistake.[37]

 Vezey also posits that his photographic evidence disproves the superior court's factual findings, and he suggests that this evidence ought to be preferred over the testimony of Green and her witnesses because of its "objective" nature. However, as the superior court noted, Vezey's photographic expert admitted that some of Green's improvements might not be visible on the aerial photographs, and various witnesses testified to noticeable improvements in the trail. Thus, Vezey's photographic evidence does not undermine the superior court's findings that Green made improvements to the trail.

 Green stipulated at trial that the path from the telephone road to her cabin was "a longstanding public trail." Vezey argues that improvements to a longstanding trail do not constitute adverse possession. Given that the road leading to Green's cabin was a "longstanding public trail," Green cannot claim title to the trail through adverse possession. Adverse possession is a doctrine that applies only to private property, and Green cannot make a public asset private

---

**36.** 35 P.3d at 25 (citations omitted).

**37.** *See* Alaska R. Civ. P. 52(a); *Adrian v. Adrian,* 838 P.2d 808, 811 (Alaska 1992) (explaining that a judge's decision to accept witness's version of events is subject to the "clearly erroneous" standard of review, and a judge's factual findings shall not be overturned unless we are "left with a definite and firm conviction on the whole record that the judge made a mistake" (internal citations omitted)).

through the use of the doctrine.[38] Although Green has fee simple title to the land forty feet to the west of her property, including the trail, her property is subject to an easement where the trail passes through her property. And because the easement similarly runs the entire length of the public trail, Green will have use of the trail pursuant to the trail easement that crosses Vezey's land.

## V. CONCLUSION

Because Vezey's Rule 60(b) motion was not timely filed, we AFFIRM the superior court's decision denying that motion. The evidence presented at trial supports a finding that Green adversely possessed the trail leading to her property and forty feet to the west of her cabin, but not all of the land 300 feet to the west. Therefore, the superior court's decision on that issue is AFFIRMED as to the forty feet to the west of Green's cabin but REVERSED as to the remainder of the 300 feet to the west and REMANDED to the superior court for entry of judgment consistent with this opinion.

CARPENETI, Justice, with whom BRYNER, Chief Justice, joins, dissenting.

CARPENETI, Justice, with whom BRYNER, Chief Justice, joins, dissenting.

Today's Opinion looks only to a portion of the evidence supporting the superior court's factual finding that Angela Green had adversely possessed the land in question, and then concludes that the evidence is insufficient. But if one looks at all of the evidence before Judge Savell, it is clear that there was sufficient evidence to support his conclusion. For that reason, I would affirm his decision. Accordingly, I dissent.

The Opinion begins by characterizing Judge Savell's decision as resting "primarily" on the fact that Green had cleared and improved a western trail leading to the property. While it is true that Judge Savell put

some weight on this evidence, there was much more evidence on which he relied, including evidence that Green blocked the road at the point that "her property" began, that she cleared the western portion of the property, that she flagged the property along the line marking its western boundary, and that her neighbors considered the western portion of the land to be "her property." The evidence supporting the superior court's decision includes the following:

1. Green did substantial work along the trail, in effect turning it into a road, and she chained it off at the point that corresponded to what she claimed as her land—about 300 feet to the west of her cabin. Green testified, "it's a claim this is my property, keep out, so I put a sign up." Her testimony was corroborated by her near neighbor William Ridder's description of where her driveway began. Even granting that by its previous use the trail had become public, and that one cannot adversely possess public land (and that at most she therefore shares in an easement over the road), her chaining off of the road is strong evidence of the extent of her claim to the land that the road crosses.

2. In addition to clearing around the cabin site and working on the road, Green did clearing "under the canopy." She testified that in 1983 "instead of just focusing on the road I started clearing out the—between the trees there, and so I wouldn't say it looks—would look park-like, but so that there wouldn't be a fire hazard from old, old trees that were lying around or whatever." As she testified, in addition to clearing for the cabin and doing work on the road, she did *"clearing out the west end under the tree canopy, the smaller ones, and the other end, so...."* (Emphasis added.) When asked why the smaller ones were taken out, she responded: "Well, because I thought it looked better and it made it less of a fire hazard. I didn't want to just look from the house and, bam, there was the ugly woods, you know. I wanted it

---

**38.** *See, e.g., Price v. Eastham,* 75 P.3d 1051, 1058 (Alaska 2003) (stating that a prescriptive easement may not burden government interests); *see also* AS 38.95.010, which provides:

No prescription or statute of limitations runs against the title or interest of the state to land under the jurisdiction of the state. No title or interest to land under the jurisdiction of the state may be acquired by adverse possession or prescription, or in any other manner except by conveyance from the state.

.to be pretty." This testimony about clearing out the west end under the tree canopy supports the trial judge's findings that "[b]e-cause Green was using and clearing the trail *and western portion* ..., she necessarily oc-cupied the western land [for the requisite period]." (Emphasis added.)

3. Responding to Vezey's attorney's ques-tion whether it was true that "nothing else" was being done to the property other than the house construction, Green said no, "[t]here was always work going on *in the woods*, all, all around that property; there was always work." (Emphasis added.) It is true that this answer was to a question as to 1986, but Green constantly distinguished be-tween work on "the road to the west" and "the area to the west" in describing the work.

4. The clearing work in the woods need not have been extensive. As we made clear in our earlier decision in this case, whether the claimant's physical acts are enough de-pends on the character of the land in ques-tion.[1] For remote rural land, three weeks of sheep grazing during the entire year was deemed to be enough to establish adverse possession in *Cooper v. Carter Oil Co.,*[2] a case we cited with approval in *Nome 2000 v. Fagerstrom.*[3] Surely for the land in question in this case, about which a witness at the first trial testified, "[i]t'd take a fool to live up there in the cold winter months,"[4] it was enough to make major improvements to the access road, block off that road so as to make it—as a neighbor testified—a "driveway" on the property, flag the edge of the property, and do some clearing under the canopy of trees on the property.

5. We have relied on "community repute" to support a finding of adverse possession.[5] In this regard, probably the strongest evi-dence in Judge Savell's estimation was pro-vided by two witnesses called by Vezey:

Janice Fairbanks and her husband, William Ridder. They were Green's near neighbors, and both testified to their understanding that Green's "property line" was the flagged line that they saw on the western boundary of the cabin. Fairbanks referred to the trail/ road as "Angela's driveway." In describing what she meant by "her [Green's] property," Fairbanks stated, "I know where her proper-ty started on the drive that went to her house. There was some kind of markings there on the trees." Fairbanks marked with a red X on a trial exhibit[6] the point where she believed Green's property began, which the court noted was to the west of the 300–foot line. She twice confirmed that was where she believed the Green property line to be. Ridder was asked about seeing flags on trees in the area. He answered: "[H]ere I don't recollect seeing any—oh, there might have been some flags along here, maybe through here. It's hard for me, just....." When asked what he meant by ."maybe through there," Ridder responded: "Proper-ty line.". At that point, the following ex-change occurred:

Judge Savell (referring to the proposed property line 300 feet to the west of the cabin) asked if he was referring to an area to just west of "[t]hat red line that goes up and down?" [7] Answer: "Correct."

The Court: "And you just called that the property line?"

Answer: "Right."

Shortly after that, Judge Savell interrupted the testimony and convened the parties and counsel for an in-chambers conference. Ap-parently addressing counsel for Vezey, he said: "These are your witnesses. It's devas-tating. *Two of them have now put the prop-erty even farther west than we're fighting over today.*" (Emphasis added.) He urged

1. *Vezey v. Green,* 35 P.3d 14, 21 (Alaska 2001) (*Vezey I*).

2. 7 Utah 2d 9, 316 P.2d 320, 323 (1957).

3. 799 P.2d 304, 309 (Alaska 1990).

4. *Vezey I,* 35 P.3d at 21.

5. *Id.* at 21 n. 13 (citing *Alaska Nat'l Bank v. Linck,* 559 P.2d 1049, 1054 (Alaska 1977)).

6. This exhibit, a photograph, is attached to this dissent as Attachment A. The Attachment con-tains designations that I have added to aid un-derstanding of the exhibit and to compensate for the lack of color in its reproduction.

7. The line that Judge Savell was referring to appears in Attachment A as the "Proposed West-ern Boundary (vertical red line)."

the parties to talk settlement: "You guys are knowingly going into this without any consideration of settlement.... This is turning into a blood bath." The court today dismisses this obviously very important testimony as follows: "Because Ridder indicated that he believed the property line to be west of the 300–foot boundary, his testimony is inconclusive and does not establish that Green flagged her western boundary." But the fact that Ridder's testimony would· have established an even (slightly) larger tract that was adversely possessed [8] is hardly a reason to cut back the property to substantially less than 300 feet.[9] And, as we shall see, there is sufficient evidence to support the finding that Green flagged her property.

6. Judge Savell made the following findings:

> Fairbanks considered that Green's property started on the drive that went to her house. She spoke of that trail as "Angela's driveway" and the property to the west of the Green house as "Angela's place." Assuming that Vezey's own calculations are correct, the "driveway" extends between 300 and 330 feet west of the house. In the trail west of the house, at the junction of the trail with the route north to the telephone line, there was also flagging tape, which Fairbanks saw long before Green built her house.

Judge Savell also found that Ridder saw flagging "at least a couple of years before construction began." These findings are abundantly supported by evidence. They are not clearly erroneous.

7. The court twice concludes that the testimony about flagging is "inconclusive," but this characterization ignores our limited role as an appellate court reviewing the factual findings of the trial court that heard the witnesses and saw the evidence.[10] The court first finds "inconclusive" the testimony of William Ridder about the western boundary of the property. As I have noted above, the fact that the flagging seen by Ridder established a slightly larger area than Green sought at trial did not require the trial court to disregard his testimony. That is, in effect, what this court does. The court also concludes that Green's testimony as to the flagging is "inconclusive." But it is sufficient to support the trial court's findings. Green testified without contradiction: "I marked it. I flagged it. I walked with [the surveyor]" in response to Vezey's claim during the trial that Green flagged it only later, for purposes of the lawsuit. She testified that she hired Oswald Jensen, a surveyor, in 1984, who began but did not complete the survey process. After saying "I marked it. I flagged it. I walked [it] with Oswald," Green was asked, "[d]id you go out and say, 'Okay. *Just for the purposes of this case,* I'm going to kind of scope out the areas that people—you know, that I occupied by clearing and by brushing....'" Green responded, "I did walk part of one line *to look for the flags that had been put up on* the Dora Robinson side, on *the west side.*" (Emphasis added.) In sum, Green testified that she brought a surveyor on to the property in 1984, that she marked it at that time, and that "for purposes of this case" (which was filed in 1995) she walked part of the line "to look for the flags that had been put up ... on the west side." Judge Savell appears to have accepted the inference from this testimony that the flags seen on the west side of "Angela's property" by Fairbanks and Ridder were the flags that had been put there either by Green or at Green's behest,[11] and that inference is a reasonable

---

8. Judge Savell recognized that there was a plausible claim for land slightly farther than 300 feet from the cabin, based on Ridder's and Fairbanks's testimony, but he limited his adverse possession ruling to the land 300 feet from the cabin.

9. This court's draconian reduction in the size of the western portion of Angela Green's land—from 300 feet out from the cabin down to forty feet—will have serious consequences for her. Among other things, the outhouse on the property, which the superior court found was 41.7 feet

to the west of the cabin, now apparently extends beyond her land.

10. Civil Rule 52(a) provides in relevant part: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

11. Judge Savell found: "In the trail west of the house, at the junction of the trail with the route north to the telephone line, there was also flag-

one.[12]

In order to reverse the superior court's finding that Green had adversely possessed the property to the west out to 300 feet from the cabin, it would be necessary to take for ourselves the trial judge's role in determining the meaning of witnesses' testimony, to judge the credibility of witnesses, to draw

our own inferences from the testimony (and decline to draw reasonable inferences), and in general to substitute our judgment on the facts for the trial judge's. We should not do that.[13] For these reasons, I respectfully dissent.

## ATTACHMENT A

Rule 52(a) ..., there must exist a stronger basis for overthrowing a finding of fact than a mere difference in personal judgment. Such evidentiary weight and such convictional certainty must be present that the appellate court does not feel able to escape the view that the trial court has failed to make a sound survey of or to accord the proper effect to all of the cogent facts, giving due regard, of course, to the trial court's appraisal of witness credibility where that factor is involved.

*Isaacs v. Hickey*, 391 P.2d 449, 451 (Alaska 1964) (quoting *Nee v. Linwood Sec. Co.*, 174 F.2d 434, 437 (8th Cir.1949)). Thus, we should uphold a trial court finding that is supported by the evidence "and reasonable inferences permissibly drawn from the evidence." *Diblik v. Marcy*, 166 P.3d 23, 28–29 (Alaska 2007).

ging tape, which Fairbanks saw long before Green built her house."

12. As recently as last month, we upheld a trial court finding because it was "supported by the evidence *and reasonable inferences permissibly drawn from the evidence.*" *Diblik v. Marcy*, 166 P.3d 23, 28 (Alaska 2007) (emphasis added).

13. In addition to the admonition of Civil Rule 52(a) to give "due regard ... to the opportunity of the trial court to judge the credibility of the witnesses," we have long held that the appellate court is not free to overturn a trial court's view of the facts because of a mere difference in personal judgment:

That the trial court could have viewed the facts differently, or that we might perhaps have done so, if we had been the initial trier thereof, does not alone entitle us to reverse. Under